BRUSON HEIGHTS CORPORATION, Respondent, *v.* STATE OF NEW YORK, Appellant. (Claim No. 30244.)

Third Department, March 11, 1953.

*Bernard Segal, Henry S. Salamon* and *Milton Noble* for respondent.

*Nathaniel L. Goldstein, Attorney-General (Wendell P. Brown* and *Henry S. Manley* of counsel), for appellant.

BERGAN, J.   The claimant Bruno, President of Bruson Heights, and the State of New York entered into a five-year lease for two stories of a new building in Queens County which the lessor was to construct.   The lease was dated May 28, 1948, but the State approved it July 1st.   The rented premises were to be used for an office of the Division of Placement and Unemployment Insurance of the Department of Labor.   The rent was $92,400 a year.

The time of State occupancy was governed by two separate provisions.   In one the landlord undertook to " commence construction " of the building " as soon as possible".   He was to " follow to completion " with " reasonable dispatch " to have the premises " available " to the State October 1, 1948.

There was a provision to take care of the possibility that the premises would not be ready then.   If there were delays " beyond the Landlord's control " so that the October 1st occupancy " cannot be realized ", the lease was to commence when the premises " shall be completed ".   There was a further provision that if the premises were not available before December 1, 1948 " then this lease shall be null and void ".

These two provisions, of course, can be read consistently together.   The marked elasticity in the delays " beyond the Landlord's control " clause could be regarded as sharply ended by  the " null and void " clause operative if occupancy were not available December 1st.   But in dealing with language of this kind a great deal depends on what the parties intend and how they act toward performance.

Certainly one clause which liberally carries the time of occupancy to " the day the premises shall be completed " could very well have been intended in the event of delays beyond the landlord's control, to have extended beyond December 1st, and the " null and void " clause could reasonably have been regarded as operative only if there were no delays beyond the landlord's control.   The final act of executing the lease on July 1st, only five months before the " null and void " clause would be effective for an entirely new building which the lease describes as " the proposed building to be erected " has a significant additional bearing on intent.

The claimant argued on the trial that he had the premises ready for the State's occupancy on December 1st and claimant himself testified unequivocally that it was substantially ready then.   But the Court of Claims has found, and the proof is overwhelming on the point, that the premises were not ready then, and the finding of the court that they were not ready until February 12, 1949, seems to us entirely well-founded.

Upon the finding that the premises were not ready December 1st, the State argues that under the "conditional limitation" of the lease it became "void" on that date. Where one party insists upon strict compliance with the time provisions of a contract, it is the usual rule that he himself must have done his part of the agreement on time and must not have contributed to the other party's delay.

Two cases illustrate the rule. One is *Watson & Co.* v. *Graves Elevator Co.* (202 App. Div. 10) decided in this department in 1922 where the court considered an elevator construction contract with a three-week provision. It was held that it was for the jury to say as a question of fact whether the acts of the party insisting on the strict operation of the time clause had in turn helped to cause the delay. The other is *Dannat* v. *Fuller* (120 N. Y. 554), where the same rule was applied to the erection of a circular sawmill. Language of conditional limitation is always construed in aid of the intention of the parties (*Bovin* v. *Galitzka*, 250 N. Y. 228, 232).

Nothing decided or said in *Allegany Oil Co.* v. *Bradford Oil Co.* (21 Hun 26) or in *551 Fifth Ave* v. *Wellingbrook* (199 Misc. 500) offers any authority to the contrary. In the *Bradford* case the owner of land had executed a lease to an oil driller with a provision that it be void if drilling were not started at a stated date. The date passed without the condition being met and the lessor who continued in possession leased the premises to another oil driller who maintained an action against the first lessee and the lessor to quiet title and for equitable relief. The question presented was, even conceding that the first lease was void, the procedural right of a second lessee to maintain the action "in the nature of bills *quia timet*". (Pp. 27, 30.)

In the *Wallingbrook* case the landlord had not shown itself entitled to possession on summary proceedings because it had not shown the conditions upon which a long-term lease rested had been met and which would have given the right to possession.

The Court of Claims has found that "by its conduct" the State "contributed to the delay in the completion of the building". This finding also seems to us to be sustained fairly by the record. The lease required that the landlord install electrical fixtures in "locations to be indicated by" the State, and to install "a suitable number" of convenient electrical outlets for the State's use. It was further provided that "at the direction of" the State the claimant was to subdivide the floors with ceiling-high partitions.

Thus the State had the affirmative obligation, as the building went up, of showing where the electrical fixtures were to go and of giving the claimant a partition plan, each in time to fit in with the work in progress. A partition plan was given to the claimant's architect before the lease was signed, but the architect testified that he understood that this was tentative and was to be changed. This seems to be corroborated by a letter to claimant's architect from the acting director of business administration of the division on August 3, 1948, which indicated that the " size of our smaller offices " had not been fixed and would depend on the locations of the window mullions.

Claimant's architect also testified that no layout of the partition plan was ever received from the State and that the partitions were ultimately installed according to the plan which preceded the lease. The court readily could have found that the uncertainty in which such plans were left contributed to claimant's delay.

On July 26th claimant's architect wrote the State asking for information about the electric layout for which the State was required to give directions. This subject was likewise dealt with in the acting director's letter of August 3d. He called attention to the fact it would be difficult to submit " a precise layout " but he felt that a conference with another State officer and the architect " within the next thirty days " might result in working out the problem without " a definite layout plan ".

Two months later, October 6th, claimant wrote the State calling attention to the " repeated requests " for an electric layout and stating that this was " holding-up all electrical work ". The next day the layout was sent by the State with a letter of enclosure that " We regret the unavoidable delay ".

The State having obligated itself by contract to " indicate " the locations of electrical fixtures, this last letter giving the plan and expressing regret at the " unavoidable delay " was nearly two and one-half months after the architect's request of July 26th. It was not only well past the October 1st date of occupancy, excusable if there were delays " beyond the landlord's control ", but it was within less than two months of the December 1st date which provided literal nullity for the lease if the premises were not ready.

Thus the Court of Claims was well within the record in finding that the State contributed to the delay in the availability of the premises for occupation. It is obvious that delays beyond the landlord's control had already called into operation the

clause that the term should begin when the premises " were completed ".

We think the court was right in holding that where the State thus contributed to a delay it cannot insist on exact conformity with a time clause. Whether this is waiver, as the court found, or the disability which nonperformance imposes against one who seeks to enforce a contract strictly is not crucial.

The claim did not plead waiver; but the theory of the trial, and the direction in which the proof and the arguments took on the trial show that this was the theory of the issue as adopted by counsel on both sides even though claimant also argued in the record that he had substantially performed rather than that the acts of the State excused him from performance.

The Court of Claims found in effect, although not in the full language of a true factual conclusion, that the premises would not have been ready December 1st even if the electrical plan had been delivered " earlier " than October 7th or if the State had " delivered " the partition plan. The words " it does not appear by a fair preponderance of the evidence that " precede the words in this finding.

It is fairly implicit from the other findings and the conclusions of law that the court concluded that the delay of the State contributed to the failure of the claimant to have the premises ready by December 1st and we think such a decision warranted and a sufficient ground upon which to extend the date of performance beyond December 1st. We feel that the deposition of the witness Tobin, taken by claimant and offered to be read by the State should have been received and read. We add it to the record and consider it in our decision under subdivision 1 of section 584 of the Civil Practice Act.

On February 12, 1949, claimant rented the premises to the New York Telephone Company at the rate of $90,100 a year, beginning April 1, 1949. The difference between the State's rental of $92,400 a year for four years and eight months has been found in the sum of $10,733.36. The court has awarded this amount and the sum of $7,700 rent for the month of March, 1949, which was the next full month after the premises were found to be available to the State after completion on February 12th. The award for these items in the sum of $18,433.36 with interest should be affirmed.

We turn now to two items of the award which rest on quite different grounds. They are not discussed in the State's brief but

were brought up by counsel for the State on the oral argument and thus require our detailed examination. An item of $6,726 has been awarded because claimant was required to remove the " electrical wiring " installed in accordance with the layout plan of the State and to " install new wiring in accordance with the requirements of the New York Telephone Company ".

Another sum of $20,241.70, the largest single item of the judgment has been allowed on a finding that claimant " was also compelled " in order to " meet the requirements " of the Telephone Company to remove " certain " partitions and to install " new ones " and to lath and plaster walls and ceilings.

On these two items, which constitute about 60% of the damage which has been allowed claimant, the date of January 17, 1949, assumes a prime importance. On that date claimant was notified in writing by the State Commissioner of the Division of Standards and Purchase that since the premises were not ready for occupancy on December 1st the State " considers the above lease agreement null and void " as of December 1st.

In an action by a landlord for breach by a tenant of a lease, the amount of the damage, prima facie, is the rent reserved. (*812 Park Ave. Corp.* v. *Pescara,* 268 App. Div. 436, 441.) The burden of showing mitigation would in such a case generally be on the party asserting it; (*People's Gas & Elec. Co.* v. *State of New York,* 189 App. Div. 421, 424) but where it is shown that the premises were rented to another the tenant would be entitled to such an offset against the claim for rent as a matter of course. (See the ready approach by the Appellate Term to such a solution in *Bacon* v. *Combes,* 32 Misc. 704.)

But when one leaves the field of contracts enforcible on their face where the burden of showing of mitigation is placed on the party asserting it, this rule is not so clear. The rule operates well enough in contracts for employment (*Milage* v. *Woodward,* 186 N. Y. 252) or in contracts requiring the performance of specific acts, such as publication of an advertisement over a specified period (*Ware Bros. Co.* v. *Cortland C. & C. Co.,* 192 N. Y. 439).

But there are subjects so much under the control of a party seeking recovery for breach of contract that his own acts in allowing damage to be increased may prevent recovery. Negligence or willfulness of the plaintiff in increasing damage are examples. (*Hamilton* v. *McPherson,* 28 N. Y. 72.) Thus, when the State unequivocally notified claimant on January 17th that it regarded the lease void, claimant was not at liberty to increase

his own damage by continuing to make special installations for the State. It may well be that some of the installations for which he claims would have been made in due prudence, but claimant was in full control of the progress of work and ought to show clearly on the record just what he did and when he did it in relation to the date of cancellation. To recover damage on this account, claimant had the burden of showing what he did, what he claims has resulted in his injury, and when he did it.

There is proof by the State which is uncontradicted that claimant was told in November that unless the premises were ready December 1st the State would not take under the lease. Still the negotiations and discussions between the parties continued; and for the occupation of some, but not all of the premises, the discussions continued through substantial parts of January. Claimant would have been justified in continuing to make the State's installations after December 1st.

But the disavowal of January 17th was so clear that he would not have been justified in making further specific expenditures chargeable to the tenant under the lease after that even though he might look forward to negotiating an entirely new agreement. In such circumstances the building would be deemed "available" for occupancy when it was ready without the special installations.

Damage to the landlord would be based on the cost of installation of the equipment on the special order of the State not otherwise used or useful in the premises, and the actual cost of removing such special equipment, including restoration to reasonable condition of the premises where removal marred the structure.

As far as this record discloses, the cost of the installations for the next tenant would not be part of damage that the State would be called upon to bear. The installations for the Telephone Company seem to have been of the same general kind, put in different places, as those for the State; and the rent for the two tenants was not substantially different.

There can be special circumstances in which installations required by a new tenant might so increase the landlord's cost of reletting as itself to diminish the rent in greater measure than the difference in the rent reserved appears on its face. This is not shown on the record presently before us, but we do not preclude claimant on this issue.

As far as this record shows, the special installations required by the Telephone Company were absorbed in that tenant's rent,

just as the cost of the State's special installations had been absorbed in the State's rent. A number of considerations, such as the long-term value of such improvements to the landlord, or special reasons for accommodating the new tenant by expensive alterations could enter into such a cost which would not be regarded as damage chargeable to the State.

The measure of residual damage arising from the breach of the State's lease would ordinarily be the cost of installation of any special equipment actually and physically installed before January 17, 1949, limited to that equipment so installed which was later actually removed; and the cost of the actual removal of that equipment.

Claimant has the burden of proof of showing this damage accurately and in some reliable form. He must show exactly how each installation followed a specific direction of the State, and when and at what cost it was removed; and he must show exactly when the partitions were installed according to the State plan and when and how and at what cost they were removed.

His proof which consists of mere generalizations by his own testimony, and the undigested bulking of checks paid to contractors wholly unsegregated and running many months after the Telephone Company had taken possession does not begin to meet that burden of proof, even if his theory of liability were applicable.

Claimant's broad generalities are not proof of any facts. He testified: " I had to take all the main partitions down and all the wires, because there was all different partitions. " He said that on February 12th " Everything was incomplete " and in compliance with the State's plans. This is a fair example of the kind of testimony, and frequently reiterated, offered by claimant in the case.

The statement on which the electrical claim was based was one made by the electrical contractor in October, 1949, ten months after cancellation, and contains not the slightest indication of when the work was done. The purported " bill " of the plastering contractor on which the proof of damage for replastering and repartitioning was largely based is dated February 17, 1949. It not only gives no dates and no details, but it is not even a bill but an " estimate ".

These matters must be proved by a witness knowing the exact facts, if the State is to be charged. Claimant himself indicated in his testimony he had no personal knowledge of the facts. " I was not on the job * * * Ask the Superintendent and he can recollect better than I can. "

These sections of the claim are based on a separate theory of liability from the loss of rent claim, which is the prima facie damage for a breach of the lease, and are quite separate items in legal theory and in fact. They should be severed. So much of the judgment as is based on them should be reversed on the law and the facts and a new trial ordered. We see no need of trying over again the parts of the claim that should be affirmed.

This would be the practice that would prevail in the Supreme Court and it is appropriate to this claim under the statute. (Court of Claims Act, § 9, subd. 9.) It is the practice to be followed on appeal. (Civ. Prac. Act, § 584, subd. 2; *Bremer* v. *Manhattan Ry. Co.,* 191 N. Y. 333; *Ashmead* v. *Sullivan,* 198 App. Div. 885.)

The judgment should be modified by affirming so much of it as is based on rental loss; the other items of damage stated in the claim should be severed and the portions of the judgment based on them should be reversed on the law and the facts and a new trial ordered, with costs to the State to abide the event.

FOSTER, P. J., COON, HALPERN and IMRIE, JJ., concur.

Judgment modified by affirming so much of it as is based on rental loss; the other items of damage stated in the claim are severed and the portions of the judgment based on them reversed, on the law and facts, and a new trial ordered, with costs to the appellant State of New York to abide the event.