**David H. RUBINGER and William R. McAllister, Plaintiffs,**

v.

**INTERNATIONAL TELEPHONE & TELEGRAPH CORPORATION, Defendant.**

United States District Court
S. D. New York.

May 3, 1961.

William R. White, and David C. Broderick, New York City, for plaintiffs.

Laporte & Meyers, New York City, for defendant; Jules E. Yarnell, Norman Marcus, New York City, of counsel.

FREDERICK van PELT BRYAN, District Judge.

Plaintiffs in these two actions, David H. Rubinger and William R. McAllister, are the assignees of Rubinger-McAllister Corporation, a New York corporation, of which they were the sole stockholders. The actions arise out of a so-called regional merchandiser's agreement between plaintiffs' assignor and the Capehart-Farnsworth Company, a division of defendant International Telephone & Telegraph Corporation (I. T. & T.) dated March 8, 1956, for marketing the Capehart line of radios, television sets and high fidelity phonographs in the New York metropolitan area.

Rubinger is a resident of New York. McAllister is a resident of Pennsylvania. Defendant is a Maryland corporation. The matters in controversy exceed $10,000. This court has diversity jurisdiction under 28 U.S.C. § 1332.

Since plaintiffs' interests are identical with those of their assignor, plaintiffs will be referred to as Rubinger-McAllister. The matters in controversy involve the Capehart-Farnsworth Company, a separate division of defendant with its own officers. Defendant will be referred to as Capehart.

In the first action (Civil 119–226) plaintiffs claim that Capehart breached the regional merchandiser's agreement with this assignor by selling all of the Capehart merchandise inventory consisting of radios, television sets, high fidelity phonographs, components and parts to Ben Gross Corporation on or about May 10, 1956, some two months after the agreement was entered into. Plaintiffs' theory is that under the agreement with Capehart Rubinger-McAllister was entitled to purchase the merchandise inventory sold to Ben Gross Corporation, that it was not offered any opportunity to do so, and that it was thereby deprived of the profits which would have inured on resale. Damages claimed on the trial amounted to $1,120,092.43.

In the second action (Civil 110–252) plaintiffs seek to recover commissions claimed to be due to Rubinger-McAllister under the regional merchandiser's agreement on four orders for Capehart merchandise alleged to have been obtained during the term of the agreement. Other items claimed to be due from the respective parties to one another have been settled by stipulation and it is conceded that apart from the four items in dispute $516.45 is owing by Rubinger-McAllister to Capehart. A claim in the second action for fraud and deceit, seeking damages in the sum of $1,500,000, was discontinued by the plaintiffs during the course of the trial.

The trial of the first action commenced before me without a jury. Early in the trial it became apparent that the issues in the second action were so interwoven with those in the first that both should be tried together. The court, sua sponte, consolidated the two actions for purposes of trial with the consent of the parties. The trial of both then proceeded to completion.

### 1. The Regional Merchandiser's Agreement.

In 1956 Capehart was engaged in the manufacture of radio, television and high fidelity phonograph sets at Flora and Ft. Wayne, Indiana. It had previously sold its merchandise through regional distributors who were middlemen buying merchandise from the manufacturer for their own account and selling it to retail dealers at a profit.

Early in 1956 this system of distribution was changed and Capehart thereafter sold through regional merchandisers operating under a standard form of agreement. Regional merchandisers were assigned certain exclusive rights in allotted territories, acting largely as selling agents to retail dealers on a commission basis.

David Rubinger had had wide experience in merchandising radio and television sets. He had been for many years vice-president of Gross Distributors, Inc., in charge of its Stromberg-Carlson Division, distributing Stromberg-Carlson radio and television products. William McAllister had been in the employ of Capehart-Farnsworth since 1939 and had been its regional manager of the northeastern states.

In late February and early March 1956 there were conversations between Rubinger and McAllister and officers of Capehart with a view to becoming regional merchandisers for the New York metropolitan area under the new plan of distribution, replacing Dorfman-Endel, Inc. which had previously served as the Capehart distributor there. As a result of these discussions Rubinger-McAllister Corporation was formed by Rubinger and McAllister to act as the Capehart regional merchandiser in that area. On March 15, 1956, at Ft. Wayne, Indiana, the standard printed form of regional merchandiser's agreement, which is the subject of this action, was entered into between Rubinger-McAllister and Capehart. The agreement was backdated to March 8, 1956.

Under the terms of this agreement Capehart assigned to Rubinger-McAllister an "exclusive franchise" for the merchandising of Capehart tradename radios, radio phonographs, television sets and high fidelity sets and equipment for the home in the area comprising the five New York City counties and Westchester, Nassau and Suffolk. Capehart, however, reserved the right to sell directly to distributors of its small set radios and to certain other large-scale users and national distributing organizations. Service parts and tubes were excluded from the franchise.

The agreement had no fixed term but remained in force until terminated by mutual agreement, or upon ten days' written notice given by either party to the other.

Rubinger-McAllister agreed to devote its best efforts to the promotion and marketing of Capehart products through franchised retail dealers; to be governed by Capehart's established quotas for its territory; to maintain a showroom and office and pay its operating business expenses; to maintain an adequate and efficient sales force and supervise servicing facilities set up by retail dealers; to solicit retail dealers for Capehart subject to acceptance by Capehart; to merchandise Capehart products through such dealers; and not to ship or deliver Capehart products to any other regional merchandiser or any dealer outside its territory.

It further agreed to be bound by the procedures issued by Capehart for the handling of its products and, upon the termination of the agreement, not to use the name "Capehart" in any manner in connection with any business it conducted.

Capehart agreed to ship all signed orders accepted by it to its retail dealers within the designated territory, subject, however to causes beyond its control, and to pay Rubinger-McAllister "overrides" in the nature of commissions thereon. It reserved the right to allocate and allot its production, sales and shipments in such manner as it deemed best and to make shipments against orders in part, or not at all, without liability for failure to ship. It was provided that "any orders placed by the regional merchandiser for his own account, if accepted by the company, shall also carry" commissions. Capehart might deduct a percentage of periodical commissions so as to accumulate a reserve for its protection against loss. Upon the termination of the agreement, or at any time during its term, Capehart was given the "absolute right" to re-purchase from Rubinger-McAllister all Capehart products it may have purchased.

Rubinger-McAllister immediately opened offices in a two-room hotel suite at the Hotel Sheraton Plaza in New York, and commenced doing business under the regional merchandiser's agreement. Messrs. Rubinger and McAllister were the sole officers of the corporation, acted

as its salesmen and comprised its entire staff. They obtained orders from retail dealers which were in turn transmitted to Indiana for acceptance by Capehart. Capehart maintained a stock of merchandise in its own warehouse in Brooklyn. When orders were accepted by Capehart the merchandise was shipped to the purchaser from the warehouse and Capehart billed the customer directly.

The operations of Rubinger-McAllister as a regional merchandiser continued for some two months only. On May 11, 1956 it received a notice from Capehart advising it of the termination of the agreement ten days thereafter. The notice became effective on May 21, 1956. During the short period of its operations Rubinger-McAllister sold some $300,000 worth of Capehart merchandise, principally to large retail outlets in its territory.

### 2. The transactions between Capehart and Ben Gross Corporation.

The ten-day notice of termination received on May 11, 1956 was sent by Capehart upon the successful completion of negotiations which it had been carrying on with the Gross interests who had been engaged in the home electronics field for some years and had formerly represented Stromberg-Carlson.

Apparently I. T. & T. desired to liquidate the radio, television and phonograph business carried on by Capehart, to close down its plants at Flora and Ft. Wayne, Indiana, manufacturing these products, and to get out of this phase of its business entirely. There had been preliminary talks with the Gross interests in late February and early March of 1956, even before the original merchandiser's agreement had been entered into with Rubinger-McAllister. Serious negotiations commenced about mid-April of 1956 with a view to the sale of the entire Capehart business.

On May 1, 1956 the first of two agreements was entered into between Capehart and Ben Gross Corporation, which had been newly formed by the Gross interests. Under the May 1st agreement Capehart sold to Ben Gross the Capehart name, copyrights, trademarks and goodwill, its plant at Flora, Indiana, all of the machinery, tools, dies, jigs and equipment used in manufacture, its drawings, plans, samples and advertising materials, the bulk of the "Capehart art collection" used primarily in promotion, and a license to sell Capehart merchandise. In addition, Capehart granted Gross an option to purchase any of its merchandise inventory remaining on hand on August 1, 1956, reserving the right to use the Capehart tradename in disposing of such merchandise during the interim. It agreed not to engage for a period of twenty years in the manufacture of radio, television and phonograph products under the tradename Farnsworth. The price was not to exceed $760,000, on which the Gross interests paid $375,000 down.

Negotiations then continued looking toward the sale of the Capehart inventory, which up to then had not been entirely checked and collated, and the settlement of other unresolved matters relating to the Capehart business.

On May 10, 1956 the negotiations culminated in a second agreement by which Capehart agreed to sell to Ben Gross all of its merchandise inventory, components and stock of replacement parts at prices based upon scheduled percentages of standard cost, consisting of material, labor, burden and build-up as they appeared on Capehart's cost analysis sheets. Capehart undertook to continue to store the merchandise in its various warehouses up to August 1, 1956. Ben Gross had the right to withdraw merchandise from the warehouses at which time title passed. A schedule of payments was provided so that Ben Gross could finance a substantial portion of the purchase price out of monies received on resale of the merchandise.

The May 10 agreement further provided that Ben Gross would carry out Capehart's obligations under its warranty agreements outstanding with customers who had purchased sets at retail and the servicing of such customers. It

also provided that Capehart should furnish to Ben Gross a list of its distributors and regional merchandisers and granted Ben Gross the right to sell merchandise to them. Capehart agreed to send immediate notice of termination to all of its distributors and regional merchandisers, and upon termination of such agreements Ben Gross was free to sell merchandise as it chose.

The sum of $600,000 was paid on account by Ben Gross on the execution of the May 10 agreement. The total amounts which Ben Gross paid under both agreements totalled $3,504,120.94.

Thus, by May 10, 1956 Capehart had disposed of its entire radio, television and phonograph business and had removed itself permanently from that field. Ben Gross was then free to carry on the Capehart business for its own account. The notice of termination to Rubinger-McAllister of May 11, 1956 was sent by Capehart in accordance with its agreement of May 10 with Ben Gross.

Rubinger-McAllister was not entirely unaware of what was occurring. While it had not been able to get any information from Capehart there were rumors in the trade that a sale of the Capehart business was impending. On May 5 there had been a temporary freeze in the processing of orders which Capehart claimed was necessary in order to take final stock of its inventory. Thereafter Capehart continued to fill various orders until the regional merchandiser's agreement terminated on May 21, 1956.

After May 21 Ben Gross Corporation, having changed its name to Capehart Corporation, proceeded to market the Capehart merchandise. After some initial difficulties it obtained an order from R. H. Macy & Company for some $500,000 of Capehart products. Macy advertised these products widely, and as a result it became easier to make sales. By the end of 1956 almost all the inventory had been disposed of. Sales were made for delivery to stores in various parts of the country, though many of them were made through purchasing agents or departments located in New York.

Ben Gross also proceeded to set up facilities and staff to carry out the Capehart warranty obligations in East Orange, New Jersey, and continued these operations at substantial expense for well over a year, until all of the obligations had been fulfilled at a cost claimed to have been in excess of $150,000.

Ben Gross did not engage in any manufacturing operations in the United States, though apparently it had contemplated doing so. However, after the disposition of the merchandise inventory it arranged for the manufacture of merchandise in Great Britain which it sold for a time under the Capehart name without great success.

3. The first action. (Civil 119–226)

In the first action plaintiffs do not seek to recover commissions on the merchandise sold by Capehart to Ben Gross Corporation, nor on resales of merchandise made by Ben Gross. Indeed, by stipulation entered into during the pre-trial conference plaintiffs expressly abandoned such claims. Plaintiffs proceed solely on the theory that they are entitled to recover from defendant the profits which Rubinger-McAllister would have made had it been permitted to purchase the merchandise inventory which Capehart agreed to sell to Ben Gross in the May 10 agreement on the same terms.

Plaintiffs' reasoning goes something like this:

The regional merchandiser's agreement granted Rubinger-McAllister an exclusive franchise to sell Capehart products (with some exceptions) in the New York metropolitan area. Ben Gross was a New York corporation, with offices here, which conducted its sales operations from New York City and sold some substantial portion of the inventory which it purchased from Capehart in New York. In view of this the agreement of May 10 by which Capehart sold the inventory to Ben Gross was an allocation of all of that merchandise to the New York territory in which Rubinger-

McAllister had an exclusive franchise. Under the regional merchandiser's agreement Rubinger-McAllister had the right to purchase merchandise for its own account for resale at a profit, as well as to sell on commission. It was therefore entitled to purchase the entire inventory sold to Ben Gross for its own account and was ready, willing and able to do so.

Thus, say the plaintiffs, the failure of Capehart to give Rubinger-McAllister an opportunity to purchase the entire inventory on the same terms as Ben Gross, was a breach of the regional merchandiser's agreement which entitles them to recover the loss of profits which Rubinger-McAllister would have made on resale if it had purchased the inventory.

There are insurmountable difficulties in the way of plaintiffs' recovery on this theory.

Plaintiffs view the May 10 agreement as a simple sale of merchandise from Capehart to Ben Gross. They are mistaken in this view. The May 10 agreement was not a separate and independent transaction. It was an integral part of the deal between Capehart and Ben Gross by which Capehart disposed of its entire business of manufacturing and selling radios, televisions and phonographs, and went out of that business entirely. The May 1st agreement for the sale of the Flora plant, machinery, tools, dies, tradenames, copyrights and goodwill, which also granted an option to Gross to purchase the merchandise inventory, was the first phase of the transaction and formulated the terms which had been agreed to at that stage of the negotiations. By that agreement Capehart committed itself to go out of the business and disposed of its facilities for continuing the business.

The negotiations did not come to an end at that point but continued as both parties had contemplated they would and resulted in the agreement of May 10 which disposed of the balance of the assets of the Capehart business, including the inventory, and required Ben Gross to assume the substantial Capehart warranty obligations to its customers.

By these two agreements Ben Gross acquired all the facilities for carrying on the business previously conducted by Capehart. Though it was not required to do so, it could have continued manufacture and sale of Capehart products as a going business.

■ I do not find that the regional merchandiser's agreement, either viewed as a whole or in its specific terms, gave Rubinger-McAllister any right to purchase the Capehart business or its entire inventory, or obligated Capehart to give it first refusal on such a sale.

The regional merchandiser's agreement merely provided for a rather usual form of sales agency in a limited designated territory. Rubinger-McAllister was given an exclusive right in that territory to sell some but not all of defendant's products. Rubinger-McAllister agreed to use its best efforts to make such sales and it was to be compensated by commissions on orders which it procured. Such orders were subject to acceptance by Capehart and it was specifically provided that Capehart had the right to allocate its production, sales and shipments "in such manner as it shall deem best". Capehart was not required to ship against orders if it saw fit not to do so, and was not liable or responsible to the merchandiser for any such allocation or failure to ship. The agreement was for all practical purposes terminable at will.

■ While agreements of this nature were at one time held to be unenforcible for indefiniteness and lack of mutuality of obligation, it is now settled that they are sufficiently definite to be enforced and are valid and binding on the respective parties. Jay Dreher Corp. v. Delco Appliance Corp., 2 Cir., 93 F.2d 275. But as Judge Hand pointed out in that case, though the agent or distributor is obligated to sell all he can of defendant's products, he is committed to no quantitative measure. Neither is the manufacturer, who is not bound to fill even such orders as the sales agent submits to him. All that the manufacturer is bound to do is to use honest judgment regarding any

orders received from the agent, and to give them equal standing with other orders considering its production and its entire market. And it may be noted that this was a case where the clause providing mutual power of cancellation had been eliminated from the agreement.

■ The agreement in suit cannot be construed to obligate Capehart, if it desired to sell its entire business, to make such a sale to its New York regional merchandiser. Capehart was not required by the agreement to remain in business at all. William S. Gray & Co. v. Western Borax Co., 9 Cir., 99 F.2d 239; Fidelity Ins. Agencies v. Citizens Casualty Co. of New York, 7 Cir., 194 F.2d 43; DuBoff et al. v. Matam Corp., 1st Dept., 272 App.Div. 502, 71 N.Y.S.2d 134. See, also, similar holdings with respect to output or requirement contracts. In re United Cigar Stores Co. of America, 2 Cir., 72 F.2d 673; Petroleum Freight Lines Corp. v. Better Gas & Oil Co., 157 Misc. 1, 282 N.Y.S. 671.

■ But in any event the agreement was terminable at will by either party on a mere ten days' notice. The power to terminate was unqualified and not even good faith was required. Bushwick-Decatur Motors, Inc. v. Ford Motor Co., 2 Cir., 116 F.2d 675; Biever Motor Car Co. v. Chrysler Corp., D.C.D.Conn., 108 F.Supp. 948, affirmed 2 Cir., 199 F.2d 758; Martin v. Ford Motor Co., D.C.E.D. Mich., 93 F.Supp. 920; Green Bay Auto Distributors v. Willys-Overland Motors, D.C.N.D.Ohio, 102 F.Supp. 151, affirmed 6 Cir., 202 F.2d 151; New York Telephone Co. v. Jamestown Telephone Corp., 282 N.Y. 365, 26 N.E.2d 295.

If Capehart wished to discontinue its business or to sell it to someone else in its entirety all it had to do was to exercise its right to terminate and its relationship with Rubinger-McAllister would have come to an end without any further liability on its part. This is in substance what it did here. In the light of the termination clause it is difficult to imagine that the parties to the regional merchan-

diser's agreement had any such intention as plaintiffs seek to ascribe to them.

I have found no cases which hold that an agreement for a sales agency gives the agent the right to purchase his principal's business or to share in the profits from the sale of such business. Indeed, such cases as have been cited to me are to the contrary. See Boisnot v. Wilson, 1st Dept., 109 App.Div. 569, 96 N.Y.S. 581, affirmed 186 N.Y. 593, 79 N.E. 1101; Amsden v. Dunham, 4th Dept., 78 App. Div. 33, 78 N.Y.S. 989; Pontefract's Estate, 40 Pa.Super. 262.

Moreover, I find nothing in the specific terms of the agreement in suit which supports plaintiffs' interpretation of it.

Plaintiffs urge that because of the exclusive nature of the agency granted to Rubinger-McAllister the choice of a New York corporation as the purchaser of the business was an invasion of the franchise and an allocation of the entire inventory to the New York territory. But plaintiffs overlook the fact that Capehart had eighteen regional merchandisers in other sections of the country operating under similar agreements, as Rubinger-McAllister was well aware. If plaintiffs' contention were correct a similar result would have followed if the business was to be sold to a buyer doing business in the exclusive territory of any of the other merchandisers. Thus, by creating a system of regional merchandisers, Capehart would have bound itself not to dispose of its entire business until it had given a first refusal to whichever regional merchandiser happened to have the territory in which a prospective purchaser was located. This would be a novel and unrealistic interpretation of a pattern of agreements setting up regional sales agencies on a national scale.

Plaintiffs also urge that Rubinger-McAllister was entitled to purchase the inventory because the regional merchandiser's agreement permitted it to purchase some merchandise for its own account. But this does not follow from the language of the agreement. The primary obligation of Rubinger-McAllister

was to act as sales agent, obtaining orders on a commission basis. Whether it be true, as defendant contends, that Rubinger-McAllister was entitled under the agreement only to purchase samples and other promotional items, or whether, as plaintiffs urge, it had the right to make more substantial purchases for its own account, it was certainly not provided or contemplated that the merchandiser would have the right to purchase either Capehart's entire business or even its entire inventory. The business, of course, included real estate and machinery in Indiana, trademarks, copyrights, goodwill and name on a world-wide basis, and numerous other items which were entirely outside the purview of a sales agency in a limited territory.

The agreement of May 10 was not an immediate sale of the entire inventory to Ben Gross. It was an agreement to sell over a rather extended period. It took cognizance of the outstanding regional merchandiser's agreements, contemplated the possibility that Ben Gross might wish to deal with them, and provided that Ben Gross should not make any selling efforts in territory covered by regional merchandiser's agreements until the agreements were terminated by Capehart under their terms.

Moreover, even if the May 10 agreement as to the inventory could be considered as a separate and independent transaction, it included small set radios, components, unfinished goods and service parts, none of which were within the Rubinger-McAllister agreement. In addition, there were affirmative obligations undertaken by Ben Gross, as part of the consideration for the inventory purchase, to assume and carry out the Capehart warranty obligations to customers all over the country which were wholly outside the regional merchandiser's framework. These obligations required not only substantial expenditures but also the conduct of rather extensive business operations over an extended period.

The Capehart inventory had been built up to supply a national market. It was sold on that basis by Ben Gross after the purchase of the entire Capehart business. There was no allocation of the merchandise comprising the inventory to the limited New York territory within the terms of the regional merchandiser's agreement which would have entitled Rubinger-McAllister to purchase it, even assuming, as I do, that Rubinger-McAllister was ready, willing and able to finance the transaction and carry out the terms of the May 10 agreement, and the May 1 agreement as well.

Thus, I hold that Rubinger-McAllister had no right under the regional merchandiser's agreement to purchase the inventory sold by Capehart to Ben Gross, or to have a first refusal of such a sale.

■ One further point remains to be considered. Plaintiffs charge that Capehart acted in bad faith by deliberately concealing its negotiations with Ben Gross and by failing to give Rubinger-McAllister an opportunity to make an offer either on the business as a whole or on the inventory separately. This, say plaintiffs, is in derogation of fiduciary obligations implicit in the relationship between the parties created by the regional merchandiser's agreement. It does appear that Capehart treated Rubinger-McAllister rather shabbily. But assuming that Capehart did not act in complete good faith, such conduct cannot create an affirmative right to purchase its entire business or its entire inventory which was not given by the agreement between the parties.

Plaintiffs here are not suing for damages for fraud and deceit. Indeed, they expressly abandoned and discontinued their claims based on that theory. The only theory on which they now proceed is for breach of an agreement obligating Capehart to give Rubinger-McAllister the right to purchase the inventory sold to Ben Gross, or to a first refusal on the same terms. They seek damages by way of loss of profits on resale for the alleged breach of this obligation and these are the only damages they sought to establish. Plaintiffs have failed to sustain such a claim and I hold that they cannot recover in the first action.

4. The second action. (Civil No. 110–252)

The second action is now limited to claims for commissions due and payable on four orders alleged to have been obtained by Rubinger-McAllister before May 21, 1956, the date the regional merchandiser's agreement terminated.

Defendant denies that there are any commissions due and owing on these transactions. It also takes the position that in any event plaintiffs cannot recover because Rubinger-McAllister so substantially breached the regional merchandiser's agreement as to relieve defendant from performing its obligations thereunder.

The latter claim can be rapidly disposed of.

Defendant claims that Rubinger-McAllister indulged in price gouging on certain orders from dealers which it transmitted to Capehart in its own name at list prices, billing dealers at prices higher than list and higher than those charged to other dealers in the territory. It is claimed that Rubinger-McAllister effected unauthorized release of merchandise on these orders from the Capehart warehouse, without Capehart's knowledge, and pocketed the difference. Defendant also claims that Rubinger-McAllister failed to carry out various obligations under the agreement to promote the sale of Capehart products.

Defendant has failed to susbtantiate this defense. It does not appear that the occurrences complained of were anything more than mildly irregular isolated acts, if they were irregular at all. Moreover, Capehart became aware of what was going on but made no attempt to cancel the agreement for any such reasons and continued to do business with Rubinger-McAllister with full knowledge of what had occurred.

(a). The Liberty Music Shops orders.

Plaintiffs claim commissions on two orders totalling $100,000, each involving the purchase of 500 Capehart sets at $100 a set, shipped by Capehart to Liberty. The first was dated January 23, 1956 and had been obtained prior to March 8, 1956, the effective date of the Rubinger-McAllister agreement. However, the shipments under this order were made subsequent to March 8.

The second Liberty order was dated March 21, 1956 and was forwarded to Capehart by Rubinger-McAllister in its capacity as regional merchandiser on or about that date. The shipments under this order, however, were not made until late June of 1956, well after the Rubinger-McAllister agreement was terminated on May 21.

Defendant takes the position that Rubinger-McAllister is not entitled to commissions on either of these orders because Liberty Music Shops was a manufacturer and not a retailer, and under the appendix to the agreement Capehart reserved the right to solicit and make sales directly to manufacturers without any obligation to Rubinger-McAllister.

It may be doubted whether the reservation by Capehart in the regional merchandiser's agreement of the right to solicit and make sales to manufacturers directly precluded commissions to the regional merchandiser on orders which it obtained from such sources.

But in any event defendant failed to establish that Liberty Music Shops came within this reservation. Defendant bases its position on testimony that Liberty put the Capehart sets which it purchased in its own cabinets containing a phonograph and a radio and sold them in combination. This is not sufficient to establish that Liberty was a manufacturer within the meaning of the reservation in the appendix to the regional merchandiser's agreement. Liberty operated four retail stores and sold the sets it purchased in those stores directly to the consuming public. For all that appears, it sold the sets under the Capehart name. It did not sell to dealers or other retailers. Indeed, it was recognized as a retail dealer in other orders which were accepted by Capehart.

As to the first order of January 23, 1956, defendant claims that since

Rubinger-McAllister did not obtain the order it is not entitled to commissions, even though the shipments were made during the period when the regional merchandiser's agreement was in effect. Under the regional merchandiser's agreement Capehart agreed to pay commissions to Rubinger-McAllister "on all orders for Capehart products as heretofore defined which are shipped into the territory to the franchised Retail Dealers herein assigned to the Regional Merchandiser".

There is no serious doubt that Liberty was a franchised retail dealer within the Rubinger-McAllister territory. Commissions were due on all orders shipped to such dealers within the Rubinger-McAllister territory during the term of the agreement. This was entirely consistent with, and, indeed, a concomitant of the exclusive franchise granted to Rubinger-McAllister. It was an added inducement for entering into the relationship contemplated by the agreement. I hold that Rubinger-McAllister is entitled to commissions on the shipments made under the January 23 order.

Defendant contends that no commissions are due on the second Liberty order of March 21, 1956 because it was not obtained through the efforts of Rubinger-McAllister but was merely a confirmation of a previous verbal order placed before the regional merchandiser's agreement went into effect. There is no merit to this contention. Liberty sent its firm order to Rubinger-McAllister on March 21 and the order was forwarded by Rubinger-McAllister to Capehart and accepted by it. It plainly comes within the purview of the regional merchandiser's agreement.

Defendant further urges, however, that Rubinger-McAllister is not entitled to commissions on this order because the sets ordered were not shipped by Capehart until after the termination of the regional merchandiser's agreement on May 21. Defendant claims that these commissions are barred by paragraph 5 of the agreement which provides as follows:

"The termination of this Agreement shall operate to eliminate as of the date of such termination all dealers' orders which shall not have been shipped by the Company and neither party shall thereafter be under any obligation to the other with respect to such orders nor shall the Company be liable to the Regional Merchandiser for any override for any products shipped into his territory subsequent to the date of such termination."

The interpretation which defendant seeks to place on paragraph 5 is not tenable in the light of the overall purpose and intent of the regional merchandiser's agreement and the circumstances under which it was terminated. Were defendant's interpretation adopted Capehart would have been in the position of being able to deprive its merchandiser of commissions on unusually large or profitable orders which had been obtained through long and arduous work by the simple expedient of exercising its right of termination and then filling such orders after the termination date. It could have delayed the shipment of orders in contemplation of termination so as to deprive the merchandiser of justly earned commissions.

It may be noted that the Liberty order of March 21 permitted Capehart to ship at its convenience. It surely was not the intention of the parties to make the convenience of the manufacturer as to shipment the test of whether or not the merchandiser would receive commissions on accepted orders.

A construction placing one of the parties to a contract at the mercy of the other is to be avoided, particularly where the contract is prepared by the party seeking the benefit of such a construction. See Taylor v. United States Casualty Co., 269 N.Y. 360, 364, 199 N.E. 620, 115 A.L.R. 822; Lowe v. Feldman, 11 Misc.2d 8, 12, 168 N.Y.S.2d 674, affirmed 6 App.Div.2d 684, 174 N.Y.S.2d 949. See, also, Aschenbrenner v. United States Fidelity & Guaranty Co., 292 U.S. 80, 84–85, 54 S.Ct. 590, 78 L.Ed. 1137; Phoe-

nix Mutual Life Ins. Co. of Hartford, Conn. v. Flynn, 83 U.S.App.D.C. 381, 171 F.2d 982, 984–985; Aron v. Gillman, 309 N.Y. 157, 128 N.E.2d 284, 51 A.L.R.2d 598; 3 Corbin on Contracts, § 559; Restatement of Contracts, § 236(d).

■ Here the regional merchandiser's agreement was on a printed form prepared by defendant and tendered to Rubinger-McAllister, who signed it without benefit of counsel. If the language of the agreement bears more than one reasonable meaning the one which operates more strongly against the defendant must be adopted. See Restatement of Contracts, § 236(d).

■ The language of paragraph 5 does not require an interpretation leading to the unreasonable and unjust result tantamount to forfeiture for which defendant contends. The first two clauses of the paragraph up to the word "nor" simply give Capehart the right not to fill any unfilled orders from the regional merchandiser remaining on its books after termination. They do not import that if such orders are thereafter filled by the manufacturer the regional merchandiser will not be entitled to its earned commissions. The effect of the final clause of the paragraph beginning with the word "nor" is simply to bar, after termination, claims for commissions on products shipped without order to which the merchandiser might otherwise be entitled under its exclusive franchise. This is the reasonable business-like interpretation of this paragraph in the light of all the facts and circumstances.

I hold that Rubinger-McAllister is entitled to commissions on the second Liberty order also.

(b). The Fifth Symphony, Allied Purchasing and Sunset Stores transactions.

Plaintiffs claim that commissions are due Rubinger-McAllister on three other transactions under the regional merchandiser's agreement.

1. The first, involving 300 Fifth Symphony models at $200 per set for a total price of $66,000, is evidenced by a telegram of April 26, 1956 from Rubinger-McAllister to Capehart asking permission to make such a sale on these terms. The telegram did not mention a customer's name but was based upon what plaintiffs claim was an oral commitment from Stern Brothers to purchase this quantity of merchandise at the price quoted.

The then current list price of Fifth Symphony sets to dealers was approximately $280 per set. Capehart wired Rubinger-McAllister on April 26 refusing permission to sell at the reduced price quoted. Rubinger-McAllister pursued the question for a day or two in conversations with Capehart officers who were in New York, and was informed that there would be no price reduction of this model since it was moving at a rate calculated to exhaust inventory by the time the new model was ready.

Plaintiffs claim commissions on the theory that the refusal of permission to make this sale was not in the exercise of fair and honest business judgment and was in bad faith since the Fifth Symphony sets were priced at $110 per set in the sale of the entire inventory to Ben Gross under the agreement of May 10.

Plaintiffs have failed to establish that Rubinger-McAllister was entitled to commissions on this transaction. No firm order was forwarded to Capehart for this merchandise. The wire of April 26 and the subsequent conversations were merely in the nature of inquiries.

But apart from this, the prices quoted were considerably less than the current dealers list price in effect at that time. No Fifth Symphony sets were sold at the low quoted price. Under the terms of the regional merchandiser's agreement any orders taken were subject to acceptance by Capehart and Capehart reserved the right to allot its production, sales and shipment as it deemed best.

In the normal course of events Capehart could not be said to have breached the regional merchandiser's agreement by refusing permission to sell at a price substantially below the current list.

█ The impending negotiations with Ben Gross for the sale of the entire business may, in fact, have been the reason for refusing permission to make the sale, as plaintiffs claim. But even if that were the reason, that fact does not establish that Capehart was not acting within its rights in making such allocation of its production and sales as it deemed best, or that it was acting in such bad faith or without such honest business judgment as to breach the regional merchandiser's agreement. It cannot be said, under the circumstances, that Capehart did not have sufficient business reasons, which it was entitled to act upon, for refusing permission to make the Fifth Symphony sale.

2. On May 3, 1956 Rubinger-McAllister transmitted to Capehart an order of Sunset Appliance Stores for 100 sets at $113 a set for a total of $11,300. The order called for a $3 advertising allowance to the purchaser, reducing the net price to $110 per set. The current list price for the sets ordered was $135 and such sets had never been sold by Rubinger-McAllister at less than $118 per set, and then only with special permission from Capehart.

The order was not accepted by Capehart and no shipment was made thereon. At the time this order was placed Capehart was holding up all shipments pending the completion of the negotiations with Ben Gross as to the disposition of its inventory.

Here, too, in the normal course of events Capehart would have been entirely justified in refusing this order at a price substantially below the established list price. The fact that Capehart did so because of the pending negotiations with Ben Gross for the sale of its entire business does not establish such bad faith or failure to exercise honest business judgment on its part as to constitute a breach of the regional merchandiser's agreement entitling Rubinger-McAllister to commissions.

3. Much the same thing can be said of the order obtained by Rubinger-Mc-Allister from Allied Purchasing Corporation for 300 console TV sets at $105 per set for a total of $31,500. This order was obtained on May 7, 1956. The current list price of these sets was approximately $135 and none had been previously quoted by Rubinger-McAllister for less than $118 per set. These sets were apparently ordered by the purchasing department of Allied in New York for delivery to retail stores in its chain, all outside the New York territory. The order did not specify any shipping dates, as was usual with firm orders.

Rubinger-McAllister was unable to obtain prospective delivery dates from Capehart for transmission to Allied. Capehart replied to a wire from Rubinger-McAllister concerning this order, advising that all shipments were being held up pending the completion of its negotiations as to disposition of inventory. The order was never accepted by Capehart and no shipment was made thereon.

The considerations which apply to the Sunset order apply to this order also, and plaintiffs have not established that Rubinger-McAllister is entitled to commissions on this order.

In the first action, Civil No. 119–226, defendants are entitled to judgment against the plaintiffs dismissing the complaint.

In the second action, Civil No. 110–252, plaintiffs are entitled to recover the amount of commissions due to Rubinger-McAllister on the two Liberty Music Shops transactions at the rates payable under the Rubinger-McAllister agreement, with interest from the time when such commissions were due and payable under the agreement, less the sum of $516.45 concededly owing by Rubinger-McAllister to defendant.

Judgment will be settled before me in accordance with this opinion on five days' notice. This opinion constitutes my findings of fact and conclusions of law pursuant to Rule 52, F.R.Civ.P., 28 U.S.C.A.