David H. RUBINGER and William R. McAllister, Plaintiffs-Appellants,

v.

INTERNATIONAL TELEPHONE AND TELEGRAPH CORPORATION, Defendant-Appellee.

David H. RUBINGER and William R. McAllister, Plaintiffs-Appellees,

v.

INTERNATIONAL TELEPHONE & TELEGRAPH CORPORATION, Defendant-Appellant.

Nos. 13, 14, Dockets 27205, 27234.

United States Court of Appeals Second Circuit.

Argued Oct. 22, 1962.

Decided Nov. 27, 1962.

Lumbard, Chief Judge, dissented in part.

William R. White, New York City (David C. Broderick, William H. Coogan, Julian A. Ronan, E. Allan Farnsworth, Lawrence P. King, Sullivan, Donovan, Hanrahan, McGovern & Lane, New York City, N. Y., on the brief), for plaintiffs.

Jules E. Yarnell, New York City (Ernest S. Meyers, Laporte & Meyers, New York City. on the brief), for defendants.

Before LUMBARD, Chief Judge, and MOORE and HAYS, Circuit Judges.

LUMBARD, Chief Judge.

This is an appeal from a judgment of the United States District Court for the Southern District of New York, 193 F. Supp. 711 (1961), entered in two actions consolidated below. In No. 27205, the plaintiffs appeal from the dismissal of their complaint. In No. 27234, the defendants appeal from an award to plaintiffs in the amount of certain commissions claimed to be due them under an agreement between the parties. Jurisdiction is based on diversity of citizenship; the parties have stipulated that New York law is applicable. We affirm the judgment in No. 27205. We agree that the judgment as to the first order in No. 27234 should be affirmed. Judge Moore agrees with Judge Hays' view, stated in a separate opinion, that the judgment as to the second order should likewise be affirmed. As to this, I dissent, and state my reasons therefor later in this opinion.

Early in 1956, the plaintiffs, David Rubinger and William McAllister, entered into discussions with the defendant, International Telephone & Telegraph Corporation, concerning a merchandising arrangement for the Capehart-Farnsworth Company, a separate division of the defendant, which manufactured such products as radios, television sets, and phonographs. On March 15, 1956, Capehart entered into an agreement, effective as of March 8, with the Rubinger-McAllister Corporation, established by the plaintiffs for that purpose, whereby Rubinger-McAllister became Capehart's regional merchandiser for the New York City area. The contract, titled "Regional Merchandiser's Agreement," gave Rubinger-McAllister an "exclusive franchise" to merchandise most of the Capehart products in the territory covered. Rubinger-McAllister agreed to devote its best efforts "to the promotion of the sale and use of the Capehart products * * * and to the marketing thereof through retail dealers directly franchised

by the Company"; to maintain and stock a showroom for the display of Capehart products; to maintain an office and pay its own business expenses; to employ a sales force which would call on retailers at frequent intervals; to supervise retailers' service facilities; to solicit retailers and recommend them to Capehart for a franchise; and generally to assist Capehart in its local business. Capehart agreed to make shipment on all orders received directly from retailers or transmitted by Rubinger-McAllister and accepted by Capehart subject to the usual exceptions for war, strikes, etc. It retained the right "to allocate and allot its production, sales and shipments in such manner as it shall deem best"; in addition, it was privileged to "make shipments in part or no shipment against any order of the Regional Merchandiser or of any franchised Retail Dealer within his territory." Capehart was to pay Rubinger-McAllister a specified "override" (commission) for all filled orders placed by retailers in the area. The contract provided also that: "Any orders placed by the Regional Merchandiser for his own account, if accepted by the Company, shall also carry the override on a like basis." The contract was terminable by either party on ten-days notice.

Rubinger-McAllister opened an office and commenced doing business, the plaintiffs acting as its entire staff. In the first two months of operation, about $300,000 worth of Capehart products were sold. On May 11, 1956, Capehart mailed to Rubinger-McAllister a termination notice to become effective in ten days.

Capehart's termination followed the successful conclusion of negotiations between the defendant and the Ben Gross Corporation for the sale of the entire business of the Capehart division to Gross. Preliminary negotiations had begun in February and March, 1956, and became serious in mid-April. On May 1, Capehart and Gross signed a contract whereby Gross purchased most of the assets of Capehart, including plant, machinery, copyrights, plans, goodwill, etc. On May 10, a second contract was signed whereby Gross purchased the entire merchandise inventory of Capehart and agreed to carry out Capehart's existing warranty arrangements with purchasers. Capehart agreed to send termination notices to its distributors and regional merchandisers. The effect of the two contracts with Gross was to put Capehart entirely out of business.

### No. 27205

In the first action, the plaintiffs seek damages in excess of $1,000,000, alleging that the sale of merchandise inventory to Gross violated rights which their assignor, Rubinger-McAllister, had under its contract with Capehart. The amount claimed is based on the profits which Rubinger-McAllister supposedly would have realized if it had purchased and resold the merchandise sold to Gross. It is easier to say what plaintiffs' legal theory is not than to say what it is. They do not seek to recover commissions on merchandise sold to Gross by Capehart or later resold by Gross. They do not sue for damages alleging Capehart's fraud or deceit. They do not make any claim of injury to reputation based on the way in which Capehart terminated the agreement.

What the plaintiffs apparently do claim is that Rubinger-McAllister had an exclusive franchise covering the New York area; that by the terms of its agreement with Capehart, it was entitled to purchase for its own account and resell at a profit to retailers within its area; that it was Capehart's duty to advise Rubinger-McAllister of merchandise available for sale and the terms of sale, and to give Rubinger-McAllister an opportunity to purchase on those terms; that Rubinger-McAllister was given no opportunity to purchase the inventory sold to Gross; that since Rubinger-McAllister was ready, willing and able to make such purchase, Capehart's breach caused Rubinger-McAllister to lose the profits which it would have realized on resale of the products; and that since Gross was a New York corporation, doing business largely in the New York area, the entire

inventory sold to Gross was in effect allocated to the plaintiff's area, so that the loss should be measured on the basis of the entire inventory.

Despite the prolixity of the plaintiffs' brief, which covers thirty-one "Points" in 120 pages, the above states the substance of their claim. It is an essential premise of their theory of recovery that the agreement between Capehart and Rubinger-McAllister entitled the latter to purchase merchandise for resale; i. e., that it was not merely a sales agent, deriving its income from commissions on sales which it promoted, but it was also a distributor, purchasing for its own account and reselling at a profit. Since we reject this premise, it is unnecessary for us to consider the plethora of legal and factual objections which the plaintiffs raise to the opinion below.[1]

The plaintiffs base their contention that Rubinger-McAllister acted in a dual capacity as both sales agent and distributor on various phrases in the agreement. Primarily, they rely on Paragraph 7, which refers explicitly to purchases which Rubinger-McAllister might make on its own account. In addition, they point to the distinction drawn in Paragraph 4 between orders "of the Regional Merchandiser" and orders "of any franchised Retail Dealer within his territory"; to a provision in Paragraph 9 for shipments "to the Regional Merchandiser sight draft order bill of lading attached"; and to Paragraph 10, which gave Capehart the right on termination of the agreement to repurchase from Rubinger-McAllister any products which it had purchased from Capehart.

Although these provisions do show that Rubinger-McAllister was expected to purchase some products from Cape-

hart, they say nothing about a right to resell. An examination of the agreement establishes that Rubinger-McAllister was entitled to purchase only such products as it needed for its own use; e. g., for display and demonstration purposes. As the district judge said, the agreement "merely provided for a rather usual form of sales agency in a limited designated territory." 193 F.Supp. at 717.

Glaringly absent from the agreement are any of the provisions which one would expect to find in a contract which a manufacturer customarily makes with a distributor. Nowhere does it refer to resales by the merchandiser. Indeed, nowhere, except incidentally in connection with other provisions, does it even refer to sales by Capehart to the merchandiser. If Rubinger-McAllister were expected to make more than incidental purchases on its own account, some arrangement for payments would surely have been made; yet nothing is said about the terms of payment, except that the merchandiser shall "maintain his credit" and pay his obligations and indebtedness promptly. Capehart was authorized to retain $1,000 of earned commissions as protection against loss, protection which would scarcely be sufficient if substantial purchases were contemplated.[2]

These omissions cannot be explained as the avoidance of elaborate provisions in a contract which the parties preferred to keep simple. The provisions normal to a sales agency are spelled out with care. The merchandiser must maintain a show room and a sales force; he must supervise, not provide, service facilities; he must seek out desirable retailers for Capehart's products. Commissions are specified and the dates for payment

---

1. In its opinion, the district court considered a number of arguments. But it is clear that it believed Rubinger-McAllister to be a sales agent and not a distributor. 193 F.Supp. at 717, 718–719.

2. In their brief, the defendants have referred us to other contracts of Capehart which clearly establish distributorships and which contain all the provisions which

are missing here. We agree with Judge Bryan that the Rubinger-McAllister contract is unambiguous. We have therefore given no consideration to extrinsic evidence, including such contracts. First National Bank of East Islip v. National Surety Co., 228 N.Y. 469, 127 N.E. 479 (1920). See 4 Williston, Contracts § 609 (3d Ed. 1961).

of accumulated commissions stated. Of special significance is the fact that Rubinger-McAllister was to receive a commission even on purchases for itself. Such an indirect, almost casual, specification of sales price would be very curious if the purchases involved were expected to be substantial, as they would be in the case of a distributorship; it is a sensible convenience if purchases were expected to be only those limited ones necessary for an effective sales agency. We cannot believe that the parties to an agreement would detail all the elements of one half of their arrangement and omit entirely any direct reference to the other.

Rubinger-McAllister was a sales agent whose duty and right was to solicit orders for Capehart. Capehart had no duty to sell its products to Rubinger-McAllister for resale. This disposes of the plaintiffs' claim; having no right to purchase, Rubinger-McAllister was not legally harmed by Capehart's failure to provide an opportunity to purchase. What other of its rights Capehart may have infringed we of course do not consider.[3]

The judgment of the district court dismissing the complaint is affirmed.

### No. 27234

■ The claim involved in this appeal was that of the plaintiffs, for commissions arising from two orders for a total of 1,000 television sets, placed by Liberty Music Shops. The trial court found that the plaintiffs were entitled to recover commissions on both orders. We affirm.

On January 23, 1956, Liberty placed an order for 500 sets with Capehart (order A). Following this order, on March 8, 1956, the Merchandisers Agreement with Rubinger-McAllister became effective. The sets covered by order A were shipped between March 23 and April 4, 1956.

The second order, order B, also for 500 sets, was placed on March 21, 1956. The Rubinger-McAllister agreement terminated on May 24, 1956.[4] These sets were shipped in late June 1956.

In sum, order A was placed prior to the agreement and shipped during its continuance, and order B was placed during the continuance and shipped after the termination of the agreement. The trial court held that the plaintiffs were entitled to commissions from both orders. The correctness of that determination depends solely upon the construction of Paragraphs 5, 6 and 7 of the March 8, 1956 agreement:

"5. The termination of this Agreement shall operate to eliminate as of the date of such termination all dealer's orders which shall not have been shipped by the Company and neither party shall thereafter be under any obligation to the other with respect to such orders nor shall the Company be liable to the Regional Merchandiser for any override for any products shipped into his territory subsequent to the date of such termination.

"6. The Company will pay to the Regional Merchandiser between the 15th and the 20th of each month his override based on rates shown on the attached sheet, marked Appendix C, and made part hereof. The override shall apply on those orders shipped to the franchised Retail Dealers within his territory up to the end of the preceding month, and the Company will pay such override to the Regional Merchandiser on all order for Capehart products as heretofore defined which are shipped into the territory to the franchised Retail

---

3. The plaintiffs made much of this court's opinion in Bender v. Hearst Corp., 263 F. 2d 360 (2 Cir., 1959), in which we held that the power of an owner of a business to sell the business and thereby terminate a distributorship agreement which did not provide for termination is not without limit. That case is not in point here.

4. Although mailed on May 11 the termination was not received by the plaintiffs until May 14, and became effective 10 days later.

Dealers herein assigned to the Regional Merchandiser.

"7. It is understood and agreed between the parties that the Regional Merchandiser shall receive an override upon all filled orders placed by the franchised Retail Dealers within his territory on the basis of the Direct Dealer Price Lists. Any orders placed by the Regional Merchandiser for his own account, if accepted by the Company, shall also carry the override on a like basis."

The trial court, in holding that the plaintiffs were entitled to receive commissions for order A, quoted and relied upon the last clause of Paragraph 6, supra. Capehart contends that Paragraph 7, which refers to "filled orders placed" governs the issue of which orders are compensable, and that the purpose of Paragraph 6, which refers to products shipped, is to designate the time and amount of payment. Plaintiffs, on the other hand, argue that 7 is concerned with the basis for the commission and that 6 includes the terms relating to which orders are compensable. From a reading of the agreement neither view is compelling. We feel, however, that it is not necessary to read the phrase "during the continuance of this agreement" into Paragraph 7. Thus orders placed by a franchised retailer prior to the agreement, if filled, i. e. shipped, during the agreement should be compensable, even under Paragraph 7. Under these circumstances, it seems to us that it is the shipment date, rather than the date of placing the order, which should govern compensability and we hold that the plaintiffs should recover commissions for order A.

The following views are my own in dissent: With regard to order B, Capehart maintains that Paragraph 5, supra, eliminated plaintiffs' rights to commissions on goods shipped after the termination of the agreement. Order B was a filled order placed during the continuance of the agreement, as provided for in Paragraph 7. Further, Capehart did not consider order B to have been "eliminated" as provided by Paragraph 5. But the final clause of Paragraph 5—"nor shall the Company be liable to the Regional Merchandiser for any override for any products shipped into his territory subsequent to the date of such termination" —expressly divests Rubinger-McAllister of any rights which accrued to them as a result of placing order B under the terms of Paragraph 7. Had Capehart delayed shipment so as to terminate the Merchandiser Agreement and thus escape payment of the override, such bad faith would prevent its reliance upon the final clause.of Paragraph 5. But in the instant case, the purchaser, Liberty, requested the delay in delivery.

The majority declines to divest the plaintiffs of their rights under paragraph 7, despite what seems to me to be the clear provision in paragraph 5. Judge MOORE and Judge HAYS reach this conclusion on the ground that the plaintiffs earned the commission by obtaining the orders. Yet with regard to order A, we all agree that payment of commissions depends on shipment rather than earnings. I do not believe that the language of the agreement indicates an intention to require payment of commissions on both of these divergent bases.

I would reverse the judgment of the district court as to the second order in No. 27234.

No. 27205 is affirmed. No. 27234 is affirmed.

MOORE, Circuit Judge.

I concur in Chief Judge LUMBARD'S opinion except insofar as Judge HAYS' opinion differs and I concur in Judge HAYS' opinion in the stated differences.

HAYS, Circuit Judge.

While concurring in all other respects in Judge LUMBARD'S opinion, Judge MOORE and I believe that the judgment of the trial court awarding plaintiffs commissions on 500 television sets ordered by Liberty Music Shops on March 21, 1956 and shipped by Capehart in late June, after the termination of

the Rubinger-McAllister's agency on March 24, should also be affirmed.

The dispute turns on the proper construction of paragraphs 5 and 7 of the March 8, 1956 agreement between Rubinger-McAllister and Capehart set forth in Judge LUMBARD'S opinion. The March 21 order was clearly a "filled order placed" during the continuance of the agreement, and under paragraph 7, plaintiffs were thus entitled to commissions on the order unless divested of that right by the provisions of paragraph 5.

We are all agreed that the trial court properly construed the first two clauses of the paragraph up to the word "nor" to "simply give Capehart the right not to fill any unfilled orders from the regional merchandiser remaining on its books after termination." But Capehart did not avail itself of this option. It chose instead to fill the order after the Rubinger-McAllister Agency had been terminated.

Capehart contends that the final clause [1] now comes into play to bar commissions on "products shipped * * * subsequent to the date of * * * termination". But we cannot believe that the parties intended to enter an agreement which would permit Capehart to deprive its merchandisers of commissions on orders which they had obtained, by the simple expedient of terminating the contract and filling the orders thereafter.

The use of the disjunctive "nor" at the beginning of the last clause and the absence of any words tying the content of this clause to that which had gone before, indicates that the parties were here dealing with a new question, that is, products shipped into the territory without order by the regional merchandiser. This reading is in complete harmony with the provision in paragraph 7 that plaintiffs were entitled to commissions on all "filled orders placed" by franchised retail dealers within the merchandisers' territory.

[1]. "nor shall the Company be liable to the Regional Merchandiser for any override for any products shipped into his territory subsequent to the date of such termination."