NIAGARA MOHAWK POWER
CORPORATION, Plaintiff,

v.

GRAVER TANK & MANUFACTURING
CO., and Aerojet-General Corporation,
Defendants.

GRAVER TANK & MANUFACTURING
CO., division of Aerojet-General
Corporation, Plaintiff,

v.

NIAGARA MOHAWK POWER CORPO-
RATION, Stone & Webster, Incorporat-
ed, Stone & Webster Engineering Cor-
poration, and Chicago Bridge & Iron
Company, Defendants.

Nos. 78–CV–675, 79–CV–46.

United States District Court,
N. D. New York.

March 12, 1979.

LeBoeuf, Lamb, Leiby & MacRae, New York City, John H. Terry, Senior Vice President, Gen. Counsel and Secretary, Niagara Mohawk Power Corp., Syracuse, N. Y., for Niagara Mohawk Power Corp.; Jacob Friedlander, William G. Primps, Eric H. Moss, Howard S. Ockman, Karen Hutson, New York City, Thomas O'Neill, Syracuse, N. Y., of counsel.

Baskin & Sears, Syracuse, N. Y., O'Brien, Carey, McNamara, Scheuneman & Campbell, Ltd., Chicago, Ill., for Graver Tank & Manufacturing Co., division of Aerojet-General Corp.; Gary M. Axenfeld, Joseph Watt, Syracuse, N. Y., Tom Scheuneman, Barry T. McNamara, Peter B. Carey, William J. Campbell, Jr., Chicago, Ill., of counsel.

Mudge, Rose, Guthrie & Alexander, New York City, for Stone & Webster, Incorporated, Stone & Webster Engineering Corp.; Laurence V. Senn, New York City, of counsel.

Mackenzie, Smith, Lewis, Michell & Hughes, Syracuse, N. Y., Hopkins, Sutter, Mulroy, Davis & Cromartie, Chicago, Ill., for Chicago Bridge & Iron Co.; Jay W. Wason, Syracuse, N. Y., Mark Crane, Michael M. Conway, Chicago, Ill., of counsel.

## MEMORANDUM–DECISION

MUNSON, District Judge.

Niagara Mohawk Power Corporation ("Niagara Mohawk") and Graver Tank & Manufacturing Co. ("Graver"), a division of Aerojet-General Corporation, entered into a contract on January 4, 1974, for the fabrication and erection by Graver of the reactor primary containment steel plate liner for the Nine Mile Point Unit 2, nuclear power plant, located near Scriba, New York. (Pl. Ex. 1).[1] This plant is owned by Niagara

---

1. A containment liner is described by Jules Wainrib, a Stone & Webster employee serving as Project Manager of the nuclear power plant at Nine Mile Point 2, in ¶ 5 of an affidavit filed in this action:

Mohawk and four other New York public utilities as cotenants. (Rhode, Tr. 347–48). Stone & Webster Engineering Corporation ("Stone & Webster") is the architect-engineer for the project, and serves as Niagara Mohawk's agent at the job site. (Pl. Ex. 1 at Article VII of Agreement of January 4, 1974; Manno, Tr. 100–01).

On December 29, 1978, Niagara Mohawk notified Graver that it was terminating, effective two days thereafter, the contract for fabrication and erection of the containment liner for the Nine Mile Point 2 power plant. (Pl. Ex. 9). On the same day, Niagara Mohawk signed a contract with Chicago Bridge & Iron Company ("CB&I") for the completion of the liner (Franklin, TRO–Tr. 141; Albertson, Dep. 125–26), and commenced an action in the Northern District of New York against Graver and Aerojet-General Corporation, seeking specific performance of the termination clause of the contract, the recovery of materials fabricated for the project, and the award of damages for faulty performance.

Graver filed an action against Niagara Mohawk, Stone & Webster, Stone & Webster's parent corporation, and CB&I in the Southern District of New York, seeking the entry of an Order enjoining the termination of the contract and directing specific performance of the provisions of the contract, other than the termination clause. This lawsuit was filed on November 20, 1978, more than a month before the notice of termination was actually given, but the Complaint was not served at that time. Upon receiving notice of termination, Graver filed an amended Complaint which was served shortly thereafter. This action was transferred to the United States District Court for the Northern District of New York by an Order of the Honorable Lloyd F. MacMahon, dated January 5, 1979.

Niagara Mohawk has moved for an Order of Seizure, and Niagara Mohawk and Graver have each moved for a preliminary injunction, seeking specific performance as demanded in their respective Complaints.[2] The parties have compiled an extensive record for the Court on the present motions. A hearing was held from January 16, 1979 to January 19, 1979 and from January 23, 1979 to January 26, 1979. Numerous exhibits, including a number of depositions, were received in evidence at that time.[3]

---

The reactor primary containment-liner is an inner $3/8''$ steel liner for the primary containment, which is a reinforced concrete structure five feet in thickness. This structure is basically a large tank 91' in diameter at the cylindrical bottom with two upper conical frustums. The total structure is approximately 160' high terminating at the top with a 35' diameter head closure. This structure houses the nuclear boiler system and certain other portions of auxiliary process and safety systems and functions primarily as a gas tight membrane. Since the reinforced concrete wall is the key structure for support of the internal equipment, the necessary heavy beams are supported on beam seat/embedments capable of transmitting their load reactions to the concrete. Additionally, many piping, electrical, and instrumention [sic] penetrations pass through the liner and the reinforced concrete structure. During operation, the bottom portion of the containment will contain water and, therefore, it is clad with a layer of stainless steel in the lower 60'. The upper portion is fabricated of carbon steel.

2. On January 3, 1979, this Court granted an *ex parte* Temporary Restraining Order requiring Graver to instruct its workers to remain away from the work areas at the job site near Scriba, New York except for the purpose of effecting termination of the contract and vacating the premises. Counsel for all parties were heard in chambers on January 5, 1979, and the Court decided to vacate the TRO. An Order to this effect was signed the following day.

On January 8, 1979, Graver made a motion for a Temporary Restraining Order requiring Niagara Mohawk to permit Graver to continue the construction of the containment liner until a hearing could be held on a motion by Graver for a preliminary injunction. A hearing was held on the TRO application on January 8th, and on the following day, the Court granted a ten-day Temporary Restraining Order providing the relief sought by Graver. This Order was extended for an additional ten-day period on January 19, 1979.

3. In the second count of its amended Complaint, Graver alleges that CB&I has attempted to monopolize the relevant market for the fabrication and erection of primary steel plate nuclear containment liners in violation of § 2 of the Sherman Act. 15 U.S.C. § 2. Graver did not offer any proof on this count at the hearing on its motion for a preliminary injunction, and, therefore, the Court dismissed the motion with

On January 29, 1979, the Court issued an Order, denying Graver's motion for a preliminary injunction and Niagara Mohawk's motion for an Order of Seizure, and granting Niagara Mohawk's motion for a preliminary injunction. This Memorandum-Decision is being issued in accordance with that Order.

## I.

Subject matter jurisdiction is based upon diversity of citizenship, 28 U.S.C. § 1332, and, therefore, state law must be applied to the substantive issues involved here. The parties agree that the applicable state law is that of New York.

■ Nevertheless, the standard for determining whether to grant a preliminary injunction has been regarded as a procedural matter, and, therefore, the federal standard is controlling. See *American Brands, Inc. v. Playgirl, Inc.,* 498 F.2d 947 (2d Cir. 1974); *Joneil Fifth Avenue Ltd. v. Ebeling & Reuss Co.,* 458 F.Supp. 1197 (S.D.N.Y. 1978); *Ali v. Playgirl, Inc.,* 447 F.Supp. 723, 726 n. 6 (S.D.N.Y.1978); *Factors Etc., Inc. v. Creative Card Co.,* 444 F.Supp. 279 (S.D. N.Y.1977).[4]

■ *Sonesta International Hotels Corporation v. Wellington Associates,* 483 F.2d 247, 250 (2d Cir. 1973) sets forth the standard for granting a preliminary injunction in this circuit:

a preliminary injunction should issue only upon a clear showing of either (1) probable success on the merits *and* possible irreparable injury, *or* (2) sufficiently serious questions going to the merits to make them a fair ground for litigation *and a*

balance of hardships tipping decidedly toward the party requesting the preliminary relief.

See also *Selchow & Righter Co. v. McGraw-Hill Book Co.,* 580 F.2d 25, 27 (2d Cir. 1978); *Jacobson & Co., Inc. v. Armstrong Cork Co.,* 548 F.2d 438, 441 n. 2 (2d Cir. 1977); *Missouri Portland Cement Co. v. Cargill, Inc.,* 498 F.2d 851, 866 (2d Cir.), *cert. denied,* 419 U.S. 883, 95 S.Ct. 150, 42 L.Ed.2d 123 (1974); *Checker Motors Corp. v. Chrysler Corp.,* 405 F.2d 319, 323 (2d Cir.), *cert. denied,* 394 U.S. 999, 89 S.Ct. 1595, 22 L.Ed.2d 777 (1969). A showing of possible irreparable injury must be made by the moving party as part of the balancing of hardships under the second prong of the *Sonesta* test. *Selchow & Righter Co. v. McGraw-Hill Book Co., supra,* 580 F.2d at 27; *New York Association of Homes for Aging v. Toia,* 559 F.2d 876, 880 (2d Cir. 1977).

## II.

Article 22 of the contract between Niagara Mohawk and Graver sets forth the circumstances under which the agreement can be terminated. Subdivision A of this article deals with termination for cause while subdivision B is a convenience termination clause. Under Article 22A, Niagara Mohawk is allowed to terminate the agreement if Graver becomes insolvent or if Stone & Webster certifies that Graver is failing to perform the required work or is not prosecuting the work with promptness and diligence. On the other hand, under Article 22B, Niagara Mohawk has the right to terminate the contract "at any time for any reason" by giving Graver two days' prior written notice to such effect.[5] In terminating the contract in the present

respect to this count. Graver has, however, indicated its intention to pursue the antitrust count at a trial on the merits, and the Court, at this time, does not express any views as to the validity of this claim.

4. The Court believes that the result in this case would be the same if the New York preliminary injunction standard were applied.

5. Article 22 of the contract is set forth below:
   22. TERMINATION OF CONTRACT
   A. If (1) the Contractor shall (a) become insolvent or bankrupt, or cease, be un-

able, or admit in writing its inability, to pay its debts as they mature, or make a general assignment for the benefit of, or enter into any composition or arrangement with creditors; or (b) authorize, apply for, or consent to, the appointment of a receiver, trustee or liquidator of the Contractor or of a substantial part of its assets, or proceedings seeking such appointment shall be commenced against it; or (c) authorize or take any action under any bankruptcy, reorganization,

case, Niagara Mohawk did so pursuant to Article 22B. (Franklin, TRO–Tr. 138; Rhode, Dep. 62–63).

### A.

Graver argues that a convenience termination clause such as that contained in Article 22B can only be exercised in good faith. Niagara Mohawk disputes this contention, and argues that it has an unrestricted right to terminate the contract.

The Court is not aware of any New York cases which have considered the question of applying a requirement of good faith to the exercise of an unrestricted unilateral termination clause. Therefore, the Court must make its own determination as to what it thinks a state court would probably do if it were faced with the same case. *Ricciuti v. Voltarc Tubes, Inc.*, 277 F.2d 809, 812 (2d Cir. 1960); *Holdridge v. Heyer-Schulte Corp.*, 440 F.Supp. 1088, 1099 (N.D.N.Y. 1977).

However, while there are no New York precedents directly on point, there are a number of cases which are instructive. In

readjustment of debt, insolvency, dissolution, liquidation or other similar law of any jurisdiction, or proceedings under any such laws shall be instituted against it; or (2) the Engineers shall certify to the Purchaser that the Contractor for any reason is neglecting or is unable to provide equipment, apparatus and/or materials or to perform the work required, is careless or incompetent, is not prosecuting the work with promptness and diligence, or is failing in any way to comply with the Contract (including without limitation the specifications or drawings), then the Purchaser may, effective upon the mailing of written notice to the Contractor to such effect, terminate the Contract. In the event of such termination the Purchaser may, but shall not be obligated to, accept such portions of the equipment, apparatus and/or materials covered by the Contract as in the opinion of the Engineers may be satisfactorily used on the work and for such portions so accepted the Purchaser shall pay the Contractor such part of the Contract Price as in the opinion of the Engineers is fair and proper.

The Purchaser shall also have the right, but shall not be obligated, to enter into other contracts in order to complete the work according to the specifications and drawings, and the Contractor shall bear the costs of obtaining proposals and letting contracts for completing the work, the increase in cost, if any, as determined by the Engineers, resulting from such procedure, and any damages caused by the delays thus occasioned in completing the work. In the event of such termination and the taking over of the completion of the work by the Purchaser, the Contractor shall be entitled to no further payments under the Contract until the work is completed. If the cost to the Purchaser of thus completing the work, together with any damages caused by delay as aforesaid, shall exceed the bal-

ance due the Contractor on account of the Contract Price, the Contractor shall forthwith pay such excess amount to the Purchaser, but if the balance due on the Contract Price shall exceed the expense incurred by the Purchaser in so completing the work, together with any such damages for delay, such excess shall be paid by the Purchaser to the Contractor.

B. Without limiting the generality of paragraph A of this Article 22, the Purchaser shall have the right to terminate the Contract at any time for any reason by giving the Contractor two (2) days prior written notice to such effect. Upon receipt of such notice the Contractor and its subcontractors shall immediately discontinue all work in progress which can be discontinued without creating a hazardous condition and cancel all outstanding commitments for material, equipment and apparatus which may be canceled without undue cost. The Contractor shall notify the Purchaser of any commitment which can not be canceled without undue cost and the Purchaser shall have the right to accept delivery or to reject delivery and pay the agreed upon costs. Subject to compliance with the foregoing and any other applicable provision of the Contract, Purchaser shall pay to the Contractor in full satisfaction and discharge of all amounts owing to the Contractor under the Contract reasonable and proper termination charges. Such charges shall not include anticipated profit. The Purchaser shall be entitled to all material specially accumulated for the order and included in the above charges, shipped at its expense; or, at its option, the salvage value thereof shall be deducted from the termination charges. The Purchaser may, at its option and expense have an independent auditor agreeable to the Contractor conduct an independent examination and certify that the Contractor's charges are in accordance with Contractor's standard practice.

*A. S. Rampell, Inc. v. Hyster Co.*, 3 N.Y.2d 369, 165 N.Y.S.2d 475, 144 N.E.2d 371 (1957), the New York Court of Appeals considered whether a requirement of reasonable notice should be implied in a contract provision allowing either party to terminate the agreement "at any time." The contract in question was to be construed in accordance with the laws of Oregon, but the case does, nonetheless, appear to have some relevance in determining what a New York court would probably do if it had to decide the present case since the Court of Appeals in *Rampell* found no Oregon cases to be applicable and discussed what it regarded the general state of the law on this matter to be. The court concluded that a requirement of reasonable notice would not be read into the parties' written agreement, and stated that "where as here the parties have agreed to a termination clause, the clause has been enforced as written." 3 N.Y.2d at 382, 165 N.Y.S.2d at 486, 144 N.E.2d at 379. For this latter proposition, the court cited a number of cases, three of which held that an unrestricted termination clause was not subject to a requirement of good faith. *Bushwick-Decatur Motors, Inc. v. Ford Motor Co.*, 116 F.2d 675 (2d Cir. 1940); *Biever Motor Car Co. v. Chrysler Corp.*, 108 F.Supp. 948 (D.Conn.), aff'd, 199 F.2d 758 (2d Cir. 1952); *Sharpe v. Great Lakes Steel Corp.*, 9 F.R.D. 691 (S.D.N.Y. 1950).[6]

Another case which is instructive is *Noah v. L. Daitch & Co.*, 22 Misc.2d 649, 192 N.Y.S.2d 380 (S.Ct.N.Y.Co. 1959). That action was brought by the owners of a retail dairy and grocery store to enjoin their supplier of dairy products from terminating their distributorship agreement. The parties' agreement contained a unilateral termination clause allowing the defendant to terminate the contract, with thirty days' notice, at any time after one year from the contract's effective date. The court in that case did not specifically consider whether the power to effect termination was limited by good faith, but it did reject the plain-

tiffs' argument that they had been granted exclusive rights for an unlimited time and that the defendant had the right to terminate only for cause. While a distinction can be made between implying a requirement of cause and implying a requirement of good faith, the language of the decision would appear to have a bearing on the latter consideration as well as the former since the court stated, "where the parties have agreed to a termination clause, it must be enforced as written." 192 N.Y.S.2d at 385.

Another relevant case is *Division of Triple T Service, Inc. v. Mobil Oil Corp.*, 60 Misc.2d 720, 304 N.Y.S.2d 191 (S.Ct. Westchester Co. 1969), aff'd, 34 A.D.2d 618, 311 N.Y.S.2d 961 (2d Dept.), *mot. for lv. to app. den.*, 26 N.Y.2d 614, 311 N.Y.S.2d 1025, 259 N.E.2d 926 (1970). In *Triple T Service*, the plaintiff, the lessee of certain premises operated as an automobile service station, brought an action to enjoin the defendant from terminating a franchise agreement based upon a retail dealer contract and a service station lease. The contract and lease each provided that the original term of the agreements was to be for three years and was automatically renewable for successive three-year periods, but that either party had the right to terminate at the end of any current period, by giving ninety days' notice. Pursuant to these provisions, the plaintiff received a notice of termination. He argued that the defendant's action was arbitrary and not taken in good faith since the plaintiff's performance had been more than satisfactory during the latest three-year period. Nonetheless, the court held that the termination was valid whether it was considered under general principles of contract law or under the Uniform Commercial Code.

With respect to general contract principles, the court in *Triple T Service* stated that a court of equity will not interfere with a bargain merely because it is hard and unreasonable, and that where a con-

---

**6.** The courts in *Bushwick-Decatur* and *Biever Motor* were both construing Michigan law while it is unclear from the court's opinion what state's law was being construed in the *Sharpe* case.

tract gives either party the absolute unqualified right to terminate upon notice, "the court is precluded from inquiring whether such termination was actuated by an ulterior motive." 304 N.Y.S.2d at 198. The court further stated that

> although every commercial contract carries with it the implicit obligation of good faith and fair dealing so as not to place one party at the mercy of the other . . the implied obligations of good faith and fair dealing merely relate to obligations incurred by the parties during the term of the contract unless the relationship is continued beyond the expiration date.
> . . .

304 N.Y.S.2d at 198–99.

Another case that should be considered is *Rubinger v. International Telephone & Telegraph Corp.*, 193 F.Supp. 711 (S.D.N.Y. 1961), aff'd, 310 F.2d 552 (2d Cir. 1962), cert. denied, 375 U.S. 820, 84 S.Ct. 57, 11 L.Ed.2d 54 (1963), a diversity case in which New York law was being construed. The court in *Rubinger* held that a regional merchandising agreement did not oblige a manufacturer to give its distributor the first opportunity to purchase the manufacturer's inventory upon its sale of the entire business to a third party. The court stated that the manufacturer was not required by the merchandising agreement to remain in business at all, and that, in any event, the agreement was terminable at will by either party on ten days' notice. According to the court, this power of termination "was unqualified and not even good faith was required." 193 F.Supp. at 718. Thus, the manufacturer could end its relationship with the distributor without any further liability on its part by exercising its rights under the termination clause.

This Court recognizes that the termination provisions in *Triple T Service* and *Rubinger* were mutual in nature while the termination clause in the present case is a unilateral one. However, as indicated subsequently, this Court doubts the significance of this distinction.

Other cases which tend to indicate that the New York courts will enforce a termi-

nation clause as written include *Texaco, Inc. v. A. A. Gold, Inc.*, 78 Misc.2d 1050, 357 N.Y.S.2d 951 (S.Ct. Kings Co.), aff'd, 45 A.D.2d 1054, 358 N.Y.S.2d 973 (2d Dept. 1974); *Mobil Oil Corp. v. Lione*, 66 Misc.2d 599, 322 N.Y.S.2d 82 (Dist.Ct. Suffolk Co. 1971); *Sinkoff Beverage Co. v. Joseph Schlitz Brewing Co.*, 51 Misc.2d 446, 273 N.Y.S.2d 364 (S.Ct. Suffolk Co. 1966); and *Fleischmann Distilling Corp. v. Distillers Co.*, 395 F.Supp. 221 (S.D.N.Y.1975). See also *New York Telephone Co. v. Jamestown Telephone Corp.*, 282 N.Y. 365, 26 N.E.2d 295 (1940); *Mohawk Agency, Inc. v. American Casualty Co.*, 227 F.Supp. 745, 748 (N.D. N.Y.1964).

The cases relied upon by Graver do not support the proposition that an unrestricted termination clause is limited by a requirement of good faith. *Cycleway, Inc. v. Kawasaki Motors Corp.*, 77 Misc.2d 829, 354 N.Y.S.2d 812 (S.Ct. Oneida Co. 1974) is distinguishable from the present case. In *Cycleway*, the court upheld a distributor's right to terminate a franchise held by a motorcycle dealer, and based its ruling upon two separate grounds. First, the court indicated that the franchise agreement permitted either party to terminate the contract, with or without cause, on thirty days' notice, and ruled that "where the parties have agreed to a termination clause, it must be enforced as written." 354 N.Y.S.2d at 816. Secondly, the court found that there was no lack of cause or lack of good faith on the part of the defendant. It is clear that the court felt it was necessary to make these latter determinations, because §§ 197, 197–a of the New York General Business Law impose a requirement of cause and good faith upon the exercise of a termination provision in a motor vehicle distributorship. This Court is not aware of any statutory provisions that would impose a similar requirement in the present case.

In addition, *Zimmer v. Wells Management Corp.*, 348 F.Supp. 540 (S.D.N.Y.1972) is not controlling here. First, there is no indication in the court's decision that the employment contract, the alleged breach of which formed the basis of the plaintiff's

causes of action, contained an unrestricted termination clause. Second, in discussing the requirement of good faith, the court was specifically concerned that the employee's discharge would result in a forfeiture of stock benefits which had constituted part of the consideration for the employment agreement. The plaintiff's right to these benefits was to vest only if his initial employment term were completed and if new employment agreements were, thereafter, executed and performed. The court in *Zimmer* stated that, after a trial, it might "well conclude that the bad faith of defendants . . . [was] such that they should not be permitted to gain the benefit of the forfeiture of the Wells stock which plaintiff bought and paid for." 348 F.Supp. at 542. Termination in the present case will not result in a forfeiture since Graver has been paid for the work it has already performed.

Furthermore, *Board of Education v. Port Jefferson Station Teachers Association,* 88 Misc.2d 27, 387 N.Y.S.2d 515 (S.Ct. Suffolk Co. 1976) is inapposite. In that case, the plaintiff sought a judgment declaring that the collective bargaining agreement between the parties was invalid because it bound the board of education in perpetuity. The court agreed that a contract binding the board indefinitely would be against public policy, but rejected the plaintiff's argument that, under the parties' agreement, the teachers' association had the sole power to terminate the contract and, instead, found that the board had a reciprocal right of termination. The court in *Port Jefferson* did not consider whether the right to terminate could only be exercised in good faith, and, furthermore, the termination clause in question there was not of the unrestricted type involved in the present suit.

■ This Court recognizes that it is a well-settled principle of New York law that every contract contains an implied covenant of good faith and fair dealing. *See, e. g., Lowell v. Twin Disc, Inc.,* 527 F.2d 767, 770–71 (2d Cir. 1975); *Van Valkenburgh, Nooger & Neville, Inc. v. Hayden Publishing Co.,* 30 N.Y.2d 34, 45, 330 N.Y.S.2d 329,

333, 281 N.E.2d 142, 144, *cert. denied,* 409 U.S. 875, 93 S.Ct. 125, 34 L.Ed.2d 128 (1972); *Kirke La Shelle Co. v. Paul Armstrong Co.,* 263 N.Y. 79, 87, 188 N.E. 163, 167 (1933); *Rochester Park, Inc. v. City of Rochester,* 38 Misc.2d 714, 238 N.Y.S.2d 822, 827 (S.Ct. Monroe Co.), *aff'd,* 19 A.D.2d 776, 241 N.Y.S.2d 763 (4th Dept. 1963). However, while this principle has been applied by the New York courts to the exercise of obligations which parties owe to each other during the term of a contract, this Court, based upon the precedents previously considered, questions whether the state courts would also apply this principle to the exercise of an unrestricted right of termination.

Graver argues that New York law makes a distinction between mutual and unilateral termination clauses. Most prior New York cases construing unrestricted termination clauses have involved provisions where both parties had the right to cancel the agreement at will, but the Court thinks that it is doubtful whether the New York courts would treat differently provisions giving only one party such a right.

■ Graver contends that a unilateral termination clause, without the imposition of good faith limitations, constitutes an illusory promise, lacking in consideration. However, a notice provision, such as that contained in the termination clause in question here, prevents the promise, made by the party with the right of termination, from being regarded as illusory in nature. *McCall Co. v. Wright,* 133 App.Div. 62, 117 N.Y.S. 775 (1st Dept. 1909), *aff'd,* 198 N.Y. 143, 91 N.E. 516 (1910); *Rittaco v. Lincoln Oil Co.,* 131 N.Y.S.2d 113 (S.Ct. Westchester Co. 1954); *Realty Advertising & Supply Co. v. Englebert Tyre Co.,* 89 Misc. 371, 151 N.Y.S. 885 (S.Ct.App.T. 1st Dept. 1915); 1A *Corbin on Contracts* § 164 (1963); J. Calamari & J. Perillo, *The Law of Contracts* § 70, at 134–35 (1970).

■ While it might be argued that a unilateral termination clause is more unfair than one where the right of cancellation is mutual, this fact alone would not give the Court the authority to alter the parties' agreement. A contract is not invalid mere-

ly because the burdens imposed upon the parties are not equal. 1 Corbin, *supra*, § 27; J. Calamari & J. Perillo, *supra*, § 55. Moreover,

> [i]t is not enough to induce a court of equity to interfere that a bargain is hard and unreasonable. Every man is presumed to be capable of managing his own affairs, and whether his bargains are wise or unwise, is not ordinarily a legitimate subject of inquiry in a court of either legal or equitable jurisdiction.

*Parmelee v. Cameron*, 41 N.Y. 392, 395 (1869). See also *Texaco, Inc. v. A. A. Gold, Inc., supra*, 357 N.Y.S.2d at 956; *Division of Triple T Service, Inc. v. Mobil Oil Corp., supra*, 304 N.Y.S.2d at 198.

The Court is aware of the fact that cases from certain other jurisdictions have imposed a requirement of good faith upon the actions taken pursuant to unrestricted termination clauses. *See, e. g., Randolph v. New England Mutual Life Insurance Co.,* 526 F.2d 1383 (6th Cir. 1975) (Ohio law); *National Factors, Inc. v. United States,* 492 F.2d 1383, 204 Ct.Cl. 98 (1974) (federal law); *deTreville v. Outboard Marine Corp.,* 439 F.2d 1099 (4th Cir. 1971) (South Carolina law). While such a rule may be the "better" approach, this Court must reach the conclusion which it believes the New York courts would reach if faced with the issue presented here.

■ Since this question has not been definitively resolved in New York State, it is possible that the New York courts would place a good faith limitation upon the exercise of a convenience termination clause such as the one contained in the Graver contract, but this Court concludes, on the basis of existing precedents, that such a restriction would probably not be imposed. Therefore, Niagara Mohawk has shown a probability of success on the merits with respect to this particular issue.

### B.

■ Even if the Court were to conclude that the exercise of a convenience termination clause is limited by a requirement of good faith, the result here would not be changed since, in the Court's opinion, Niagara Mohawk has shown a probability of successfully demonstrating that it acted in good faith.

Niagara Mohawk first considered terminating the Graver contract sometime in the period between mid-1974 and mid-1975. All the contracts for the Nine Mile Point 2 plant were evaluated and renegotiated during that time frame, because of a delay in the scheduled commercial operation date of the plant. (Reese, Dep. 67; Niezabytowski, Dep. 34–35). Concerned about the reasonableness of the agreement that might be renegotiated, Niagara Mohawk considered the termination of the contract with Graver as a possible option. (Niezabytowski, Dep. 55–56). A decision was made to continue with Graver, and a contract modification was signed in July, 1975, changing the Graver compensation from a lump sum basis to a cost-reimbursable, fixed fee basis. (Niezabytowski, Dep. 57–58; Reese, Dep. 67–68; Sackett, TRO–Tr. 89).

Niagara Mohawk again considered the possibility of terminating Graver as the containment liner contractor in late 1977 and early 1978. By that time Niagara Mohawk had become dissatisfied with Graver's performance, and was particularly concerned about schedule delays that had occurred. (Manno, Tr. 28–30; Rhode, Tr. 348–49, 354–55). Personnel from Niagara Mohawk, Stone & Webster, and Graver met to discuss these problems in East Chicago, Indiana in September, 1977 and at the job site in January, 1978. (Manno, Tr. 28–29; Rhode, Tr. 349–51, 351–55; Sackett, Tr. 536–37). During this time period, Stone & Webster contacted possible replacement contractors to determine their availability (Reese, Dep. 6–7, 41–42; Sanderson, Dep. 37), but a decision was made to continue with Graver and to attempt to accelerate performance under the contract. (Reese, Dep. 26–27; Manno, Tr. 30).

Throughout 1978, Niagara Mohawk continued to believe that there were deficiencies in Graver's performance. (Manno, Tr. 31; Rhode, Tr. 356). These concerns were

conveyed to Graver in a document prepared by Stone & Webster, at Niagara Mohawk's request, in February, 1978 (Pl. Ex. 27), and at a meeting held at the job site in March, 1978 at which Niagara Mohawk, Stone & Webster, and Graver representatives participated. (Rhode, Tr. 356–57; Sackett, Tr. 540–44).

Because of its dissatisfaction with Graver's performance, Niagara Mohawk again considered terminating the Graver contract in the fall and early winter of 1978. A meeting of Niagara Mohawk, Stone & Webster, and Graver personnel took place at the job site on September 29, 1978, and the principal topics discussed at that time were increased costs and schedule delays. (Manno, Tr. 32–34, 37–38; Rhode, Tr. 358–59, 364–66). After the conclusion of this meeting, Stone & Webster orally recommended to Niagara Mohawk that it consider terminating the Graver contract. (Manno, Tr. 38–41; Rhode, Tr. 366–67). This recommendation was subsequently made in writing. (Pl. Ex. 3).[7]

Shortly after the meeting of September 29, 1978, Stone & Webster, acting on behalf of Niagara Mohawk, contacted other contractors in the containment liner industry to determine their availability: both CB&I and Pittsburgh Des Moines were contacted. (Reese, Dep. 31–39). Representatives of CB&I, Niagara Mohawk, and Stone & Webster met in Cherry Hill, New Jersey on October 20, 1978 (Albertson, Dep. 38–40; Reese, Dep. 52–58), and sometime thereafter, Niagara Mohawk requested a formal proposal from CB&I for completion of the containment liner for the nuclear power plant at Nine Mile Point 2. (Albertson, Dep. 80–81; Reese, Dep. 74). Such a proposal was submitted by CB&I to Niagara Mohawk in November of 1978. (Albertson, Dep. 102–03; Reese, Dep. 51). Niagara Mohawk thereupon entered into negotiations with CB&I for an agreement to complete

the work on the containment liner. At that time, Niagara Mohawk had not yet reached a decision on whether to continue with Graver, but wanted to have an alternative contractor available if termination of Graver should be decided upon. (Manno, Tr. 64–65, 234; Rhode, Tr. 369–71).

Certain documentary evidence indicates that a tentative schedule for effecting termination in October or November had been formulated by some individuals at Niagara Mohawk (Def. Ex. C; Def. Ex. D; Franklin Dep. Ex. 5), but these schedules were in the nature of contingency planning and were not adhered to. (Manno, Tr. 222, 226–27, 234). The letter sent by Arthur Albertson, the New York District Sales Manager of CB&I, to John Hilke, Manager of Nuclear Projects for Niagara Mohawk, dated October 20, 1978, (Pl. Ex. 16) does not compel a contrary conclusion. This letter is equivocal. While the first sentence states, "We are in receipt of your letter dated October 19, 1978 advising us that it is your intention to terminate your contract with Graver Tank for the containment liner at Nine Mile Point Nuclear Station—Unit 2,"[8] a later portion of the letter indicates CB&I's belief that Niagara Mohawk had not yet reached a decision. The third paragraph begins, "If Niagara Mohawk decides to terminate its contract with the present supplier . . ."

During the months of October and November, numerous meetings were held between Niagara Mohawk and Stone & Webster to evaluate the Graver contract. (Manno, Tr. 64).

On November 9, 1978, Gerald Rhode, Vice President and System Project Manager of Niagara Mohawk, met Hugh Sackett, Vice President and General Manager of Graver, at the Hotel Syracuse and advised him that Niagara Mohawk was considering termination of the Graver contract. (Rhode, Tr.

---

7. Letters formally certifying Graver's failure to perform satisfactorily under the contract were later prepared by Stone & Webster and submitted to Niagara Mohawk. (Pl. Ex. 18; Pl. Ex. 8).

8. The purported letter of October 19, 1978 from Niagara Mohawk to CB&I does not appear in the record. Mr. Rhode of Niagara Mohawk stated that he was not aware of the existence of such a letter. (Rhode, Tr. 384).

375–76; Sackett, TRO–Tr. 77–79). The following week, Mr. Rhode met with Mr. Sackett and Clay Matthews, Group Vice President of Aerojet-General, in Washington, D. C. At that time, Mr. Rhode expressed his concerns about Graver's performance while both Mr. Matthews and Mr. Sackett indicated their belief that a termination would have a serious effect upon Graver's business, and said that Graver would not cooperate with a voluntary termination. (Rhode, Tr. 377–82; Sackett, TRO–Tr. 80–81). On November 17, 1978, Mr. Rhode reported the general substance of what he had learned in Washington to personnel of Niagara Mohawk and Stone & Webster. (Rhode, Tr. 385–89; Haehl, Tr. 574).

A meeting between Graver and Niagara Mohawk representatives, including Mr. Sackett and John Haehl, President and Chief Executive Officer of Niagara Mohawk, was held on November 22, 1978 to discuss the Graver contract. (Haehl, Tr. 575–76; Rhode, Tr. 425–27; Sackett, TRO–Tr. 85–86). Shortly thereafter, personnel of Niagara Mohawk and Stone & Webster met to review the situation. (Haehl, Tr. 576; Rhode, Tr. 427). In this general time frame, Stone & Webster, at Niagara Mohawk's request, prepared materials evaluating Graver's performance. (Pl. Ex. 5A & 5B; Pl. Ex. 10). These materials were received by Niagara Mohawk and were used by its personnel in reaching a decision on whether to continue the Graver contract. (Manno, Tr. 53–54; Rhode, Tr. 446, 523).

Representatives from Niagara Mohawk, Stone & Webster, and Graver met again on December 7, 1978. At that meeting, possible bases for assuring satisfactory completion of the project by Graver were discussed, and Mr. Sackett presented a new proposed schedule prepared by Graver. (Rhode, Tr. 432–33; Haehl, Tr. 577–78; Sanderson, Tr. 263–64; Sackett, TRO–Tr. 87–89). Meetings of Niagara Mohawk and Stone & Webster personnel took place on December 13, 1978 and December 15, 1978 to receive Stone & Webster's analysis of Graver's new proposed schedule and to hear Stone & Webster's responses to certain questions posed by Niagara Mohawk.

(Rhode, Tr. 436–40, 447–48; Haehl, Tr. 580–82; Sanderson, Dep. 107–08). Stone & Webster indicated that, in its opinion, Graver's schedule was unworkable and would result in a further delay of the project's scheduled commercial operation date. (Rhode, Tr. 438–39; Pl. Ex. 12). At the December 15th meeting, a decision was made to send a team of Niagara Mohawk and Stone & Webster people to Graver's East Chicago facilities to assess the Graver situation first hand. (Rhode, Tr. 448; Haehl, Tr. 582; Manno, Tr. 70–71).

During the visit by Niagara Mohawk and Stone & Webster people to East Chicago, presentations were made by various Graver representatives, and Graver was asked to respond to a schedule prepared by Stone & Webster. (Manno, Tr. 70–74; Sanderson, Dep. 109). Upon his return to Syracuse, Samuel Manno, the head of the Niagara Mohawk delegation, reported to the senior management of the power company that he could not provide any assurance that Graver would complete the liner as requested. (Manno, Tr. 74–78). In addition, Warren Leland, Senior Vice President of Stone & Webster, reported to Mr. Haehl that Stone & Webster was going to continue to recommend termination of the Graver contract. (Haehl, Tr. 584).

A meeting of Niagara Mohawk and Stone & Webster senior management personnel was held on December 27, 1978, and, at that time, a decision was reached to send a letter of termination to Graver. (Rhode, Tr. 453–54; Haehl, Tr. 584–85). The Court finds, on the basis of the evidence now before it, that the termination decision was, in fact, made at that meeting and was not made at an earlier point in time as argued by Graver.

In the Court's opinion, the presently available evidence does not demonstrate that Niagara Mohawk's actions were taken in bad faith. Niagara Mohawk decided to terminate the Graver contract, because it believed that the continuation of Graver as the containment liner contractor would result in increased costs and further delays in

the scheduled commercial operation date of the Nine Mile Point 2 power plant. (Rhode, Tr. 458–67; Haehl, Dep. 25). The Court observes that Niagara Mohawk had been dissatisfied with Graver's performance over a substantial period of time and had made a number of efforts to resolve the problems. Moreover, the termination decision was made only after Niagara Mohawk had reviewed documentary material prepared by Stone & Webster and had participated in numerous meetings held to assess the situation. Some of these meetings included Graver representatives while others involved only Niagara Mohawk and Stone & Webster personnel or Niagara Mohawk people alone. Contrary to the suggestions made by Graver, the Court does not find anything improper with the fact that Graver representatives were not present at all these meetings. While it is important to have a dialogue between the owner and the contractor, the owner has the right to assess the performance of the work in private meetings with its own staff or with its architect-engineer.

The Court recognizes that there are indications in the record that some individuals from Niagara Mohawk questioned, in certain respects, the depth of Stone & Webster's analysis of the problems being experienced with the Graver contract. (Def. Ex. H; Pl. Ex. 46; Manno, Tr. 209–11, 215–18; Rhode, Tr. 439–48). The Court interprets this evidence to mean that Niagara Mohawk was taking a hard look at Stone & Webster before taking the serious step of terminating Graver, and believes that the power company made its decision to utilize Article 22B only after concluding that it agreed, in essence, with Stone & Webster's analysis. In this regard, the Court notes that the meetings held to evaluate the situation continued after the point in time that these concerns were expressed. In particular, the visit to Graver's facilities in East Chicago on December 18–20, which gave Niagara Mohawk an opportunity to make an independent assessment of Graver's capabilities, occurred after such time.

The record reveals that Graver wanted additional time to respond to the schedule presented by Stone & Webster at East Chicago on December 18–20. (Sabol, TRO–Tr. 38–39; Wescot, Tr. 883). Graver indicated that it would make its response in early January, but Niagara Mohawk terminated the contract before then. This fact, considered alone, might be regarded as significant evidence of bad faith, but the Court does not believe that this is so in the circumstances of this case. Niagara Mohawk had reviewed the Graver contract over a protracted period of time, and had finally come to the conclusion that Graver would not be able to provide the necessary assurances. The evidence now before the Court suggests that Niagara Mohawk had lost confidence in Graver's ability to meet the commitments it was making.

Evidence in the record indicates that there are certain differences between the Niagara Mohawk-Graver contract and the Niagara Mohawk-CB&I contract, and that these differences might, in certain respects, make the CB&I contract more advantageous. (Sackett, Tr. 1077–86, 1106–07). When these facts are placed in context, the Court does not believe that they demonstrate bad faith by the power company. Niagara Mohawk had greater confidence in CB&I's abilities, and, therefore, it was willing to make more concessions to CB&I than to Graver. (Pl. Ex. 6). In addition, some of the differences between the two contracts represent concepts originally advanced by CB&I, making the incorporation of such concepts in a renegotiated Graver contract of doubtful ethical propriety (Pl. Ex. 6; Manno, Tr. 230), and other differences are in recognition of the fact that the initial part of the work was not done by CB&I. (Manno, Tr. 228–29).

Accordingly, the Court concludes that Niagara Mohawk has demonstrated a probability of success on the merits in proving that it acted in good faith in exercising its right to terminate the Graver contract.

## C.

In addition to arguing that a convenience termination clause can only be exercised in

good faith, Graver contends that custom and usage in the relevant industry limits the application of such a provision to the early stages of the contract, before substantial work has been performed. Omer Ruiz, Director of Contracts for Aerojet-General Corporation, testified that the commercial understanding of a termination clause such as that contained in Article 22B is that it is to be used only in situations where the project is being cancelled. (Ruiz, Tr. 444–45).[9] Niagara Mohawk and Stone & Webster moved to exclude the testimony of Mr. Ruiz on the ground that it is inadmissible under the parol evidence rule of New York State. The Court reserved decision on the motion.

The parol evidence rule is a matter of substantive law, and, therefore, in a diversity case, state law is controlling on this question. *Vanston v. Connecticut General Life Insurance Co.*, 482 F.2d 337, 340 n.1 (5th Cir. 1973); *Plum Tree, Inc. v. N.K. Winston Corp.*, 351 F.Supp. 80, 83 (S.D.N.Y. 1972); *American Cyanamid Co. v. Elizabeth Arden Sales Corp.*, 331 F.Supp. 597, 606 n.5 (S.D.N.Y.1971); 1A *Moore's Federal Practice* ¶ 0.313 (1978). It is a well-settled principle of New York law that circumstances extrinsic to an agreement will not be considered when the intention of the parties can be gathered from the instrument itself. *West, Weir & Bartel, Inc. v. Mary Carter Paint Co.*, 25 N.Y.2d 535, 540, 307 N.Y.S.2d 449, 452, 255 N.E.2d 709 (1969); *Bethlehem Steel Co. v. Turner Construction Co.*, 2 N.Y.2d 456, 460, 161 N.Y.S.2d 90, 93, 141 N.E.2d 590 (1957); *Heller & Henretig, Inc. v. 3620–168th St., Inc.*, 302 N.Y. 326, 330, 98 N.E.2d 458, 459 (1951). Therefore, parol evidence of custom and usage is not admissible to alter or contradict the express terms of a clear and unambiguous contract. *Western Union Telegraph Co. v. American Communications Association, C.I.O.*, 299 N.Y. 177, 184, 86 N.E.2d 162, 166 (1949);

*Gull Contracting Co. v. State*, 7 A.D.2d 679, 179 N.Y.S.2d 350, 352 (3d Dept. 1958); *George Colon Contracting Corp. v. Morrison*, 162 N.Y.S.2d 841, 880–81 (S.Ct. Jefferson Co. 1954), *aff'd*, 2 A.D.2d 869, 157 N.Y. S.2d 927 (4th Dept. 1956); *Oakhill Contracting Co. v. City of New York*, 262 App.Div. 530, 30 N.Y.S.2d 567, 570 (1st Dept. 1941); 13 N.Y.Jur., *Customs and Usages* § 5 (1960).

Article 22B of the Graver-Niagara Mohawk contract provides that "the Purchaser shall have the right to terminate the Contract at any time for any reason by giving the Contractor two (2) days prior written notice to such effect." The Court finds this language to be clear and unambiguous, and, therefore, parol evidence altering or contradicting these terms is inadmissible. Accordingly, the testimony of Mr. Ruiz is stricken from the record.

#### D.

Another argument made by Graver is that Niagara Mohawk breached the contract before sending the letter of termination, and consequently, is barred from exercising the termination clause. Graver contends that Niagara Mohawk, through its agent Stone & Webster, violated its duty to facilitate the contractor's work by making numerous design changes that altered the very character of Graver's work and by failing to provide adequate plans and drawings in a timely or orderly manner. Graver maintains that Niagara Mohawk and Stone & Webster are legally responsible for the delays which have occurred in the construction of the containment liner.

Even if Niagara Mohawk, through its agent Stone & Webster, had previously breached the contract by the design changes it made or by the manner in which it submitted plans and drawings to Graver, the Court does not believe that this would change the result on the present motions.

---

9. In a deposition, James Niezabytowski, Contract Administrator for Niagara Mohawk, testified that it was not the general understanding in the industry that convenience termination clauses were subject to such a limitation. (Niezabytowski, Dep. 218–21). In view of the Court's ruling on the applicability of the parol evidence rule, it is unnecessary to determine whether Mr. Ruiz's or Mr. Niezabytowski's testimony represents an accurate interpretation of commercial usage.

If a violation had occurred and if Graver had been injured as a result, it could collect damages, but Niagara Mohawk would not be barred from exercising its rights under the termination clause. In *American Machine & Metals, Inc. v. De Bothezat Impeller Co.*, 82 F.Supp. 556 (S.D.N.Y.1949), *fin. judg. aff'd*, 180 F.2d 342 (2d Cir.), *cert. denied*, 339 U.S. 979, 70 S.Ct. 1025, 94 L.Ed. 1383 (1950), the parties' agreement contained an unrestricted termination clause, allowing the plaintiff to terminate the agreement, at any time after one year from the contract's effective date, by giving six months' notice to this effect. Defendant argued that plaintiff was barred from exercising the termination clause by virtue of its prior breaches of the contract. The court rejected this argument, holding that, under New York law, a wrongful breach of contract, prior to termination, could not defeat the right to terminate expressly granted in the contract in a case where the prior breach did not, in itself, cause irreparable injury even though the termination might cause injury of such a nature.

The cases of *Motion Picture Trade Directory Co. v. Wallace*, 186 N.Y.S. 80 (App.T. 1st Dept.), *aff'd*, 197 App.Div. 938, 188 N.Y.S. 937 (App.Div.1921) and *United States Aluminum Co. v. Calvert Lithographing Co.*, 49 Misc. 491, 97 N.Y.S. 1042 (App.T.1906) also support the proposition that, where a contract expressly permits termination on notice, a breach by the terminating party prior to giving such notice does not render the termination ineffective.

*Bruson Heights Corp. v. State*, 281 App. Div. 371, 120 N.Y.S.2d 73 (3d Dept. 1953), relied upon by Graver, does not suggest a contrary result. In *Bruson*, the court held that where the State had contributed to a delay, it could not insist upon exact conformity with a time clause. The contract in that case did not contain an unrestricted termination provision allowing the State to terminate the agreement at any time for any reason.

■ The Court will not, at this time, definitively resolve the question of whether Niagara Mohawk has committed any breaches of contract prior to exercising its rights under the termination clause, but the Court does find that any prior breaches that may have occurred were, at most, partial, rather than total breaches of contract. Therefore, Graver was not discharged from its own contractual obligations and would not have been justified in rescinding the contract for any such breaches. 10 N.Y. Jur., *Contracts* § 427 (1960); 6 Corbin, *supra*, § 1253.

■ It is well established that an owner has an obligation to facilitate the work of a contractor and to not do anything that would obstruct or impede the contractor's work, *Savin Brothers, Inc. v. State*, 62 A.D.2d 511, 405 N.Y.S.2d 516, 519–20 (4th Dept. 1978); *M. L. Ryder Building Co. v. City of Albany*, 187 App.Div. 868, 176 N.Y.S. 456 (3d Dept. 1919), but obstructions or delays are actionable only if they were not within the parties' contemplation when they made their agreement. *Johnson, Drake & Piper, Inc. v. State*, 46 Misc.2d 303, 259 N.Y.S.2d 685, 694 (Ct.Cl.1963); *Shore Bridge Corp. v. State*, 186 Misc. 1005, 61 N.Y.S.2d 32, 40 (Ct.Cl.), *aff'd*, 271 App.Div. 811, 66 N.Y.S.2d 921 (4th Dept. 1946); *Town & Country Engineering Corp. v. State*, 46 N.Y.S.2d 792, 800 (Ct.Cl.1944).

■ Evidence has been received indicating that Stone & Webster made numerous changes in the design of the containment liner. (Ault, Tr. 704–13; Sackett, TRO–Tr. 103–04). The Court finds, on the basis of the present record, that the making of such design changes was, in general, within the contemplation of the parties. In this regard, the Court observes that it is customary to make design changes in a containment liner throughout the time that the project is under construction. (Wainrib, Dep. 31, 59–61; Reese, Dep. 47–48; Sanderson, Tr. 289). Moreover, the Court notes that the contract between the parties specifically authorizes Niagara Mohawk to change the scope of Graver's work (Article V of the Agreement of January 4, 1974 & Article 27 of the July 1, 1975 Contract

Change),[10] and provides that, if the changes are material in nature, an adjustment in Graver's fee can be negotiated. (Article 27 of the July 1, 1975 Contract Change).[11] In certain circumstances, contract changes might be found to be beyond the contemplation of the parties even where the owner has the right to make alterations in the scope of the work, *Langan Construction Corp. v. State*, 110 Misc. 177, 180 N.Y.S. 249 (Ct.Cl.1920),[12] but the Court concludes that the changes made here were not of that magnitude, particularly when considered in light of the nature of the work involved in constructing a containment liner. Thus, the making of such design changes would not be actionable.

Conflicting evidence has been received concerning the alleged failure of Stone & Webster to submit to Graver the revised plans and drawings incorporating such changes in a timely or orderly manner. (*Compare* Ault, Tr. 734–37; Wescot, Tr. 814–19; *and* Noriega, Tr. 936–37 *with* Svarney, Tr. 1148–51, 1165). While such failure, if proven, might constitute a technical breach of contract, it is questionable if such a breach would be actionable since the present contract is cost plus in nature, and

Graver would presumably have already been compensated for the additional costs incurred as a result of any delays caused by the untimely or disorderly submission of plans and drawings. Nonetheless, the Court will not, at this time, foreclose the possibility that there might be certain costs, that Graver incurred, for which it could recover damages.

The Court finds, as was the case in *American Machine & Metals, Inc. v. De Bothezat Impeller Co.*, *supra*, that if any breaches were previously committed by the terminating party (Niagara Mohawk), they were not of such a nature as to constitute irreparable injury to the party being terminated (Graver).

■ Accordingly, Niagara Mohawk has shown a probability of successfully proving that any prior breaches of contract which it may have committed would not bar it from utilizing Article 22B.

### III.

#### A.

■ As previously stated, federal law is controlling as to the appropriate standard

---

**10.** Article V of the Agreement of January 4, 1974 provides,

The Purchaser shall have the right, at any time and from time to time during the continuance of the Contract, to increase or decrease the amount of, or make alterations in, the work to be performed and the materials, equipment and apparatus to be furnished under the Contract by giving to the Contractor notice of Purchaser's intention to make such change or alteration pursuant to Article 4 of the Supplementary Conditions of Contract. Article 27 of the July 1, 1975 Contract Change contains a similar provision.

**11.** Article 27 of the July 1, 1975 Contract Change states, in part,

Upon receipt of such notice by the Purchaser specifying the changes or alterations desired, the Contractor shall forthwith comply with such notice and make the changes or alteration on the basis set forth therein. If such changes cause a material increase or decrease in the amount or character of the work to be done under this Contract or in the time required for its performance, the Purchaser will negotiate an equitable adjustment by an addition to or deduction from the fixed fee to be paid to the Contractor. Any claim

for adjustment under this Article VI must be asserted in writing within 30 days from the date the change is ordered.

Another clause in the agreement—Article 22 of the July 1, 1975 Contract Change—provides that the contractor will receive compensation for standby time or project demobilization/remobilization if the contractor is delayed in the prosecution of the work by acts, negligence, or omissions of the purchaser, engineers, or other contractors.

**12.** In *Langan*, the State eliminated the portion of the contract providing for the paving of an asphalt highway when the parties could not agree on the price to be paid for additional work that was to be done. The court found that this change virtually destroyed the contract for the plaintiff since the plaintiff would have made most of its profit on the portion of the work eliminated. Changes of this magnitude were not made in the present case. Graver has a cost plus, fixed fee contract with a provision for a fee adjustment for changes of a material nature, and, therefore, the contract was not virtually destroyed by the changes made by Stone & Webster.

to apply in deciding whether to grant a preliminary injunction. Nonetheless, the Court must look to state law to determine whether there is an underlying basis for granting the equitable relief of specific performance in the circumstances of this case. See *Franke v. Wiltschek,* 209 F.2d 493, 496–97 (2d Cir. 1953); *Ali v. Playgirl, Inc., supra,* 447 F.Supp. at 730; *Copylease Corp. v. Memorex Corp.,* 408 F.Supp. 758, 758–59 (S.D.N.Y.1976).

■ Graver argues that Niagara Mohawk's demand for specific performance must be denied, because its lawsuit is based upon an irrelevant statute—New York Uniform Commercial Code § 2–716. The Court agrees with Graver that the Uniform Commercial Code, which only applies to the sale of goods, does not govern the contract involved here. The essence of the agreement between Niagara Mohawk and Graver is for the construction and erection of a primary containment liner.[13] The element of service, therefore, predominates, and the provision of materials is merely an incidental feature of the transaction. Hence, the contract does not fall within the ambit of the Code. See *North American Leisure Corp. v. A & B Duplicators, Ltd.,* 468 F.2d 695, 697 (2d Cir. 1972); *Schenectady Steel Co. v. Bruno Trimpoli General Construction Co.,* 43 A.D.2d 234, 350 N.Y.S.2d 920, 922–23 (3d Dept.), *aff'd,* 34 N.Y.2d 939, 359 N.Y.S.2d 560, 316 N.E.2d 875 (1974); *Suchy, Inc. v. Stuerzel,* 82 Misc.2d 40, 370 N.Y.S.2d 316, 317 (S.Ct.App.T. 1st Dept. 1975). See also *Perlmutter v. Beth David Hospital,* 308 N.Y. 100, 104–05, 123 N.E.2d 792, 793–94 (1954).

The fact that the Uniform Commercial Code is not applicable to the present contract does not defeat Niagara Mohawk's request for specific performance. While Niagara Mohawk, in its initial memorandum, places primary reliance upon § 2–716

of the Code to establish the merits of its claim for relief, subsequent papers filed by the power company, in particular its Post Hearing Memorandum, indicate that it is relying upon additional authorities as well.

■ Since the Code does not govern this case, the Court must look to the common law of New York State to assess the propriety of granting specific performance here. Under the common law, a court may grant a decree of specific performance only if (1) there is a valid contract between the parties; (2) the plaintiff has substantially performed under the contract and is willing and able to perform its remaining obligations; (3) the defendant is able to perform its obligations; and (4) the plaintiff has no adequate remedy at law. 55 N.Y.Jur., *Specific Performance* § 4 (1967); *Burke v. Bowen,* 40 N.Y.2d 264, 386 N.Y.S.2d 654, 353 N.E.2d 567 (1976); *Besser v. K.L.T. Associates, Inc.,* 42 A.D.2d 725, 345 N.Y.S.2d 659 (2d Dept.1973), *aff'd,* 34 N.Y.2d 687, 356 N.Y.S.2d 295, 312 N.E.2d 478 (1974); *Morrow v. Constantino,* 158 N.Y.S.2d 155 (S.Ct. Suffolk Co. 1956), *aff'd,* 4 A.D.2d 769, 165 N.Y.S.2d 710 (2d Dept. 1957); *Lo Biondo v. D'Auria,* 45 A.D.2d 735, 356 N.Y.S.2d 679 (2d Dept. 1974). When these elements are present, the granting of specific performance is within the sound discretion of the court. *Mofsky v. Goldman,* 3 A.D.2d 311, 160 N.Y.S.2d 581, 584 (4th Dept. 1957); *Cole Export Import Co. v. Beller,* 25 Misc.2d 583, 205 N.Y.S.2d 773, 776 (S.Ct. Bronx Co. 1960).

■ It is clear that there exists a valid contract between the parties in this case. Secondly, the contract has been substantially performed by Niagara Mohawk. Graver's fee claims under the contract have been paid (Franklin, TRO–Tr. 147–48), and the power company stands willing and able to perform its obligations under the termina-

---

13. The contract states, in relevant part,

The Contractor hereby agrees (a) to provide all the materials, equipment and apparatus, (b) to provide all the labor, tools, services and facilities (unless and to the extent made available by the Purchaser as provided in Schedule B attached hereto), and (c) to perform all the work and do all things necessary for the proper construction and erection and completion of the reactor primary containment-steel plate liner for Nine Mile Point Nuclear Station–Unit 2 of Niagara Mohawk Power Corporation, located near Scriba, New York.

tion clause—to pay reasonable and proper termination charges, to pay for materials demanded under the terms of Article 22B, and to reimburse the contractor under a cost plus fixed fee format for prior commitments that cannot be cancelled without charge. Any breach that might have previously been committed by Niagara Mohawk is relatively minor, and, therefore, would not bar a decree of specific performance. *Morrow v. Constantino, supra; Schnipper v. Westgate Building Corp.,* 108 N.Y.S.2d 576 (S.Ct. Nassau Co. 1951). See also *Glasco Gun Club, Inc. v. Francello,* 41 A.D.2d 872, 342 N.Y.S.2d 687 (3d Dept. 1973).

Furthermore, it appears that Graver has the ability to perform pursuant to Article 22B. This can be done by Graver's vacating the job site and shipping the materials specially accumulated for the contract. Finally, the record demonstrates that Niagara Mohawk lacks an adequate legal remedy. Monetary damages—the traditional remedy at law—is inadequate in this case, because of the difficulty in computing the amount of such damages. *Drukill Co. v. Alpha Alpina, S.A.,* 223 N.Y.S.2d 51 (S.Ct. N.Y. Co. 1961); *Republic Aviation Corp. v. Republic Lodge No. 1987,* 10 Misc.2d 783, 169 N.Y. S.2d 651, 667 (S.Ct. Queens Co. 1957). This factor will be discussed in detail in the section dealing with the requirement of irreparable harm as part of the preliminary injunction standard.

It might be argued that a decree of specific performance should not be granted with respect to the shipment of materials fabricated for the project, because Niagara Mohawk can avail itself of the legal remedy of replevin. It is apparently for this reason that the power company has moved for an Order of Seizure for those articles that can be physically seized by the United States Marshal.

Graver has raised various questions as to whether Niagara Mohawk has satisfied, in all respects, New York's replevin statute, as recently, amended, CPLR § 7101

*et seq.,* but it is unnecessary to resolve this matter since the Court finds that replevin is not an adequate legal remedy in the circumstances of this case, and that, therefore, it does not have to be exhausted before equitable relief in the nature of specific performance is granted. Many of the materials accumulated by Graver for the Nine Mile Point 2 project are located outside New York State—at Graver's facilities in East Chicago, Indiana, in transit to Scriba, New York, or at various subcontractors' factories. (Wainrib affidavit ¶ 14). Article 71 of the CPLR appears to apply only to the recovery of chattels located in New York State, cf. *First National Bank v. Dunn,* 97 N.Y. 149, 156 (1884); *General Electric Credit Corp. v. Waukesha Building Corp.,* 259 F.Supp. 958 (W.D.Ark.1966),[14] and, therefore, if equitable relief were not granted, an action for replevin would have to be brought in each jurisdiction where the materials are located. The prevention of a multiplicity of suits is recognized as a sufficient basis for equity jurisdiction. 20 N.Y. Jur., *Equity* §§ 73–76 (1976); *Lynch v. Metropolitan E. R. Co.,* 129 N.Y. 274, 29 N.E. 315 (1891); *Pfohl v. Simpson,* 74 N.Y. 137 (1878).

Moreover, a replevin action would not insure the recovery by Niagara Mohawk of even those chattels located in New York. By posting a bond, Graver could reclaim the chattels or have them impounded pending judgment or further order of the Court, CPLR § 7103(a), (b), and if Niagara Mohawk were ultimately awarded possession, but was not actually in possession at such time, the judgment would, in the alternative, award the value of the chattel. CPLR § 7108(a). Therefore, replevin is not an adequate substitute for specific performance. See *Chabert v. Robert & Co.,* 273 App.Div. 237, 76 N.Y.S.2d 400 (1st Dept. 1948); *Raftery v. World Film Corp.,* 180 App.Div. 475, 167 N.Y.S. 1027 (1st Dept. 1917); *Titus v. Empire Mink Corp.,* 17 N.Y. S.2d 909 (S.Ct. Westchester Co. 1939); 5A Corbin, *supra,* § 1157.

---

**14.** The terms of the statute itself suggest that it was only intended to be applicable when the chattels can be found within the boundaries of New York State. *See* CPLR § 7102(c)(7), (d)(2), (d)(3).

While an Order of Seizure could not be granted with respect to materials located outside New York, this Court, by virtue of the fact that it has personal jurisdiction over Graver, has the authority to grant a decree of specific performance, requiring Graver to ship the materials specially accumulated for the project, no matter where such articles might be located. See *Gresov v. Shattuck Denn Mining Corp.,* 29 Misc.2d 324, 215 N.Y.S.2d 98 (S.Ct. N.Y. Co. 1961); *Dubinsky v. Blue Dale Dress Co.,* 162 Misc. 177, 292 N.Y.S. 898 (S.Ct. N.Y. Co. 1936); *Madden v. Rosseter,* 114 Misc. 416, 187 N.Y.S. 462 (S.Ct. N.Y. Co.), *aff'd,* 196 App.Div. 891, 187 N.Y.S. 943 (1st Dept. 1921); 7A J. Weinstein, H. Korn & A. Miller, *New York Civil Practice* ¶ 6301.26 (1977); 43A C.J.S. *Injunctions* § 175b (1978).

Therefore, Niagara Mohawk has shown a probability of successfully demonstrating an underlying basis for the granting of the equitable relief of specific performance in the circumstances of this case.

### B.

In view of the Court's determination that Niagara Mohawk has shown a probability of successfully proving that the termination was lawful, it is unnecessary for the Court to decide the propriety of granting the kind of specific performance sought by Graver—the enforcement of all provisions of the contract other than the termination clause, thereby allowing Graver to complete the containment liner. However, the Court questions whether such relief would be appropriate even if it had resolved the issues involving the lawfulness of the termination in Graver's favor. During the remainder of the time needed to complete the containment liner, there will be a continual need for the contractor building the liner to interface with Stone & Webster and other contractors (Sanderson, Tr. 249–50; Westcot, Tr. 919–21), and numerous disputes as to scheduling and other matters might arise. Courts of equity are reluctant to grant specific performance in situations where such performance would require judicial supervision over a long period of time. *Grossman v. Wegman's Food Markets, Inc.,* 43 A.D.2d 813, 350 N.Y.S.2d 484, 485 (4th Dept. 1978); *Blitman Construction Corp. v. Denbel Realty & Construction Co.,* 13 Misc.2d 888, 178 N.Y.S.2d 249, 250 (S.Ct. N.Y. Co. 1958); *Queens Plaza Amusement, Inc. v. Queens Bridge Realty Corp.,* 22 Misc.2d 315, 36 N.Y.S.2d 326, 327 (S.Ct. Queens Co. 1942), *rev'd on other grounds,* 265 App.Div. 1057, 39 N.Y.S.2d 463 (2d Dept. 1943).

Recent New York cases granting specific performance of building and construction contracts—*Grayson-Robinson Stores, Inc. v. Iris Construction Corp.,* 8 N.Y.2d 133, 202 N.Y.S.2d 303, 168 N.E.2d 377 (1960) and *Bradigan v. Bishop Homes, Inc.,* 20 A.D.2d 966, 249 N.Y.S.2d 1018 (4th Dept. 1964)—are ones where the court was confirming an arbitration award. To a significant extent, these cases are predicated upon the notion that since the parties have consented to the award of such relief by arbitrators, their agreement should be enforced. In any event, while there may not be a hard and fast rule against applying a remedy of specific performance to a building or construction contract, there is a recognized discretionary power in a court to refuse such a decree. *Grayson-Robinson Stores, Inc. v. Iris Construction Corp., supra,* 8 N.Y.2d at 138, 202 N.Y.S.2d at 306–07, 168 N.E.2d at 379.

### IV.

### A.

As required by the first *Sonesta* test, Niagara Mohawk has demonstrated not only a probability of success on the merits but also possible irreparable injury. Such irreparable injury will occur as a consequence of the difficulty in determining the monetary damages Niagara Mohawk will suffer as a result of a delay in the scheduled commercial operation date for the nuclear power plant at Nine Mile Point Unit 2.

The Court finds, on the basis of the evidence now before it, that Nine Mile Point 2's presently scheduled commercial opera-

tion date of October, 1984 will probably be delayed if Niagara Mohawk is barred from terminating the Graver contract. The Court recognizes that most of the evidence in the record concerning Graver's ability to complete the containment liner in a timely manner—documentary evidence prepared by Stone & Webster for Niagara Mohawk's review and statements made by Niagara Mohawk or Stone & Webster personnel in meetings at which Graver was not present—was received only to show Niagara Mohawk's state of mind in reaching its termination decision and was not received for purposes of establishing the truth of the matters asserted. However, the Court does believe that there is sufficient evidence (not subject to the previously mentioned limitation) for the Court to conclude that the completion date of the project will likely be delayed past October, 1984 if Graver is allowed to remain on the job. Graver has proposed a schedule based upon a construction logic whereby the embedments are to be placed in the cones of the containment liner while they are in place rather than while on the ground. (Rhode, Tr. 463; Haehl, Tr. 577–78). If such a method of construction is used, crane access to the area where the equipment is being placed will be limited, and the length of time needed to complete the containment liner will be increased, thereby making it unlikely that the scheduled completion date will·be met. (Pl. Ex. 13; Sanderson, Tr. 277–88, 328–31; Wainrib, Dep. 71–74; Stoyer, Tr. 637–38).[15]

There are some indications in the record that Graver, if so instructed by Niagara Mohawk, would be willing to install the embedments on the ground, rather than in the air. (Def. Ex. AX; Sackett, Tr. 1060–62). Nonetheless, there is adequate evidence upon which to base a finding that, even if ground installation were utilized, a delay in the scheduled completion date of the project would probably result if Niagara Mohawk were barred from terminating

Graver. This conclusion is supported by Mr. Sackett's statement, made at a meeting of Niagara Mohawk, Stone & Webster, and Graver personnel on September 29, 1978, that an October, 1984 project completion date was in jeopardy (Sanderson, Tr. 263; Manno, Tr. 33–34), and is also supported by the opinion testimony of Mr. Sanderson and Mr. Manno, who have had considerable experience in dealing with the Graver contract situation. (Sanderson, Tr. 289–90; Manno, Tr. 74).

A further indication that the continuation of Graver as the containment liner contractor will likely result in schedule delays is the present status of work being done at the job site. According to Graver's schedule, the knuckle must be set by February 1, 1979, but this cannot be done because of an ongoing investigation of problems concerning Cadwell sleeves. (Sackett, Tr. 1055; Boyea, Tr. 663). As a consequence, the work that was being done by Graver at the time of the hearing was not of much significance to the critical path. (Sackett, Tr. 1053–54). On the other hand, the CB&I schedule would permit the setting of the knuckle at a later date (Boyea, Tr. 1167–68), and it should be noted, in this regard, that, after a review of CB&I's proposals, Stone & Webster has concluded that CB&I will be able to perform in accordance with the planned completion date. (Sanderson, Tr. 290, 312–14).

The failure of Graver to turn over to Niagara Mohawk materials which it has fabricated for the Nine Mile Point 2 project will, likewise, probably result in delays. CB&I's schedule is based upon the assumption that it will receive the metal parts for the containment liner presently in Graver's possession (Stoyer, Tr. 633), and, therefore, the failure to secure such parts will create the risk of further delays. (Sanderson, Tr. 292 to 296–b).

The Court concludes, on the basis of the presently available evidence, that a delay in

---

15. At the time of the hearing, the Court reserved decision on the admissibility of exhibit 13 (slides prepared by Stone & Webster). The Court now holds that this exhibit is admissible as demonstrative evidence.

the scheduled commercial operation date of Nine Mile Point 2 will result in substantial costs to Niagara Mohawk. The financial impact will be felt in two areas: an increase in the total capital cost of the plant and an increase in the cost of energy for the time period during which the facility is not available. (Rhode, Tr. 467–68; Haehl, Tr. 586, 602). It is also possible that a delay in the commercial operation date of Nine Mile Point 2 might affect the reliability of the electrical system in New York State. (Rhode, Dep. 147–50; Haehl, Tr. 610–11). Graver has introduced testimony from Dr. Kanu Shah, a consultant to the electrical utility industry, who stated his opinion that, on the basis of a load resource analysis, Nine Mile Point 2 was not needed in 1984. (Shah, Tr. 970–71, 996; Def. Ex. AN). The Court does not give a great deal of weight to Dr. Shah's testimony in view of the fact that he acknowledged the inherent unreliability of such estimates made for a period of time significantly in the future. (Shah, Tr. 1022–23).[16] In any event, even if load growth does not establish a "need" for the Nine Mile Point 2 plant in October, 1984, delay in completion of the project will harm Niagara Mohawk by increasing the fixed capital cost and by eliminating the possibility that less economical generating units could be taken off the line. (Sanderson, Tr. 305–06).

Testimony has been received concerning the damages which Niagara Mohawk could expect to suffer if there is a delay in the scheduled commercial operation date of the Nine Mile Point 2 project: Mr. Rhode stated that the additional capital cost would be $6–8 million per month and that the incremental energy costs would be $10 million per month. (Rhode, Tr. 468–71). Nevertheless, the Court believes that money damages are not an adequate substitute for preliminary injunctive relief in this case since it would be extremely difficult to as-

sess that portion of the damages, resulting from delay, which would be specifically attributable to Graver's remaining on the job pending a trial on the merits. In this regard, it should be noted that Graver, if allowed to do so by Court Order, would presumably continue to work on the project, and while the work being done on the liner at the time of the hearing was not on the critical path, no doubt, at least some of the work, which would be performed prior to a plenary trial, would advance, to a certain extent, the critical path. It would probably be very hard to determine how much further the critical path might have, otherwise, progressed. Furthermore, it is quite possible that factors other than the progress of work on the containment liner might contribute to delays in the final completion date of the project, and it might be hard to assess precisely the impact of each such factor. Hence, because of the difficulty in determining the proper amount of money damages, the threat of harm to Niagara Mohawk, if its motion for a preliminary injunction is denied, is irreparable in nature. *Danielson v. Local 275, Laborers International Union of North America,* 479 F.2d 1033, 1087 (2d Cir. 1973); *Interphoto Corp. v. Minolta Corp.,* 417 F.2d 621, 622 (2d Cir. 1969).

## B.

The same issues are raised by the preliminary injunction motions made by both Niagara Mohawk and Graver, and, therefore, the Court's finding that Niagara Mohawk has established a probability of successfully proving its case at a trial on the merits necessarily means that the Court also determines that Graver has not demonstrated a probability of success. Hence, Graver has not satisfied the first *Sonesta* test.

Furthermore, it is questionable whether the issues raised by Graver are of sufficient

16. In preparing his analysis, Dr. Shah relied upon data submitted in 1978, which covered the time period up to the end of 1977 (Shah, Tr. 988–89, 1014), but he later questioned the relia-

bility of data available six months or a year earlier. (Shah, Tr. 1022–23). Hence, the data relied upon by Dr. Shah, himself, would be of doubtful reliability in the near future.

doubt and magnitude to satisfy the first part of the second *Sonesta* test. In any event, in the Court's opinion, the balance of hardships does not tip decidedly in Graver's favor. First of all, it must be remembered that in order to receive relief—either an injunction or money damages—the harm, which Graver expects to suffer, must be legally cognizable harm. *Checker Motors Corp. v. Chrysler Corp., supra,* 405 F.2d at 324. Of course, Graver does not have to definitively establish its case at this stage of the proceedings, but the Court seriously doubts if Graver will be able to prevail ultimately. In the unlikely event that Graver is successful at a plenary trial, it should be possible to ascertain money damages to compensate Graver for lost profits on the Nine Mile Point 2 job and for incidental expenses associated with the termination.

Graver argues that, by not completing the containment liner at Nine Mile Point 2, it will lose invaluable experience which is necessary for a company to compete effectively in the relevant industry. However, the Court believes that the weight, which should be given to this argument, is diminished by the fact that Graver is presently working on containment liners for other projects. (Matthews, Dep. 49–52). Graver also argues that its reputation will be irreparably damaged if this Court should deny its motion for a preliminary injunction. To the contrary, the Court believes that any effect upon Graver's reputation is more likely to result from the fact that a customer is dissatisfied than from the actions taken by this Court.[17] In any event, if Graver's argument, in this regard, is correct, then its reputation should be rapidly vindicated if, in fact, it is able to prevail at trial.[18]

Against the hardships that might be suffered by Graver, if its motion is denied, must be balanced the irreparable harm (previously considered) which Niagara Mohawk will suffer if Graver's motion is granted. The Court does not believe that the balance tips sharply in Graver's favor.

Accordingly, Graver's motion for a preliminary injunction and Niagara Mohawk's motion for an Order of Seizure are denied, and Niagara Mohawk's motion for a preliminary injunction is granted. Until a trial on the merits, Graver is directed to specifically perform under Article 22B of the contract between Niagara Mohawk and Graver, entered into on January 4, 1974 and amended several times thereafter.[19]

17. Graver received more inquiries from utilities concerning the causes of the problem than the status of the lawsuit. (Sackett, Tr. 1114).

18. There is evidence in the record indicating that, if Graver loses business, it may be the result of factors other than the termination by Niagara Mohawk. (Pl. Ex. 20 at 72–76; Smil-lie, Dep. X4–X13, X56–X58, X69–X72, X77–X79).

19. Under the Court's Order of January 29, 1979, Niagara Mohawk has been required to file an undertaking in the amount of $11 million.